Mathews, J.
delivered the opinion of the court.* The plaintifF and appellants sues, in forma pauperis, to recover his liberty, and judgment having been given against him, he appealed.
The evidence, which is all written in the form of depositions, and other documents, comes up with the record, and a statement of the case is made by the counsel.
Several exceptions, to the admission of testimony, appear to have been taken, during the course of the trial, in the district court, by each of the parties, and although not regularly re *276 duced to writing, and signed by the judge, might be noticed, under the circumstances of the case and the agreement of the counsel, were it necessary for the purpose of obtaining a knowledge of any fact, important to a correct decision of the suit. The district judge having ad- mitted all the testimony offered, we deem it useless to enter into a formal investigation and decision of each exception: but will proceed to state the facts as drawn from the evidence, which was properly received. A summary of such of them as are necessary, to arrive at proper legal conclusions, may be laid down as follows:
West. District.
Sept. 1817.
In theyear 1765 or 1766, Duchene, an In- dian trader, brought an Indian woman to Ope- lousas, whom he sold to Caretien, the father of the defendant and appellee; she died not long after, leaving a female child, who remain- ed peaceably with Chretien as his slave, until some time during the period in which the Ba- ron de C rondelet was governor of the pro- vince of Louisiana: when she went to New- Orleans, with her master, for the purpose of charming her freedom before the proper tribunal. It appears from a certificate of Peter Pedesclaux, a notary, that a suit was commenced, but no record remains, or can be found, of the manner West. District. Sept. 1817. *277 in which it terminated. She returned with Chretien, and remained with him as his slave, until his death, which happened after the United States took possession of the country, untier the treaty, made with the French government, in the year 1803 ; she was called Agnes, and brought several children, while held in a state of slavery, by Chretien, of whom the plaintiff and appellant is heir. After the death of the ancestor of the defendant, and the distribution of his estate, Agnes and some of her children, all descended from the Indian woman sold by Duchene, as above stated, brought suit in the parish court of St. Landry against suit owners, among whom, was the present defendant, to recover their freedom. From a judgment by default, which afterwards became final, an appeal was taken to the superior court, of the late territory of Orleans, where the cause was tried by a jury, and a verdict rendered in favour of the then plaintiffs and appellees, which was set aside, by the court, on account of some misconduct in the jury, and a new trial ordered. The case remained in this situation, until the change in the country, from a territorial to a state government, and was then transferred with others to the fifth district, under the new system. As the person, who became judge of that *278 district, had been engaged as counsel in the cause, it was transferred for trial to the second district; and the then appellee, who was the original plaintiff, not appearing to prosecute his suit, was declared by the court to be nonsuited, and judgment was accordingly entered.
It appears from the depositions of a number of witnesses, (admitted by the parties to have been correctly taken, and to be proper evidence in the cause,) that at the time the Spanish government took possession of the country, viz. in 1769, under the secret treaty of cession, made between France and Spain in 1763, many of the inhabitants of the colony, which had been established and settled under the authority of the French government, held and possessed Indians as slaves, and it seems to have been a belief pretty general among them, that the practice of holding Indians in slavery was tolerated and authorized by that government. The fact that a considerable number of Indians and their descendants were held in slavery, as the period alluded to, is clearly proven.
These being all the important facts in the case, we will proceed to examine the plaintiff and appellant's claim to freedom, on the ground taken by his counsel.
*279 It is grounded on a judgment of the parish court of St. Landry, as being res judicata, by a competent tribunal. But, if it be determined that it be not conclusively supported and established by the judgment, it is contended that the plaintiff and appellant is free by birth, being the lineal descendant of an Indian woman.
I. Having already given a concise history of the suit, (to its final decision) in virtue of which the plaintiff and appellant claims his freedom as a res judicata, it remains only for us to ascertain the just and legal effects of the judgment of nonsuit obtained against him, in the court of the second district.
It is contended, that this judgment, given at the instance of the then appellant, amounts, on his part, to a desertion of the appeal; because, although defendant, in the inferior tribunal, in appeals according to the judicial system of the late territory of Orleans, the appellant assumed the place of plaintiff.
It is true, the appellant, even when he had been the original defendant, became actor, after having obtained the appeal. It became his duty to bring up the record, to cite his adversary, who was bound to answer on the appeal. But, after the appellee had appeared, and filed West *280 the answer required of him by law, viz. that there wits no error in the proceedings, it became the duty of the superior court not to proceed to hear the appeal, on the issue there joined, error vel non, but to hear and determine the cause on the pleadings transmitted. For this purpose, a trial de novo took place, uninfluenced by any thing that had been done below. The evidence was not confined to what had been there offered and, to bring the merits completely before the court, the very pleadings were allowed to be amended. 1807, 1. If a jury had been prayed for below, it was above a matter of course, without being demanded anew. Bayon vs. Rivet, 2 Martin, 148. Whether the trial was before a jury or the court, no judgment of affirmance or reversal was pronounced, but the verdict or judgment was always as on an original suit.
Being acted de novo, after the answer of the appellee, the cause was before the supreme court in nearly the same state as it would have been the court below, after a new trial had been granted. The plaintiff was required by law to make out his case, unaided by the previous judgment, if it was in his favor, disembarrassed from it, if it was adverse, and the consequences of his failure to produce proof in support of his action, were necessarily the same in both courts. same in both courts.
*281 The answer, that there was no error, amounted to nothing more than an admission that the appeal was properly before the court. It was a plea to the merits, which precluded, after it any allegation against the propriety of sustaining the appeal. This clearly results from the absence of any provision in the act, by which the whole evidence given below might have been transmitted to the court, above, without which the judgment of the inferior court cannot be examined: and when we consider that other proof than that which was given below, was received at the trial above, and that the superior court was directed to hear and determine on the pleadings transmitted, not on the issue joined above, error vel non, that no direction was given to affirm or reverse, but to hear the cause ex parte, in the absence of the appellee, and to give such a judgment as the nature of the case might require, and issue execution thereon, the conclusion is irresistible, that there was to be a trial and judgment de novo. Indeed, any person the least conversant with the practice of the superior court, under the late territorial government, knows that appeal cases were tried as original ones. If, as already stated, a jury had already been prayed for below, it was had as a matter of right above. If the cause had been *282 tried, in the first instance, by the judge, on the appeal, the superior court heard the evidence; and the original defendant, even when he was the appellant, always had the benefit of the rule adore non probante absolvitur reus. When the trial was by jury, the cause was submitted to them on the original issue, unless, on an amendment of the pleadings, a new one was joined. Being charged to try the same issue, it follows, as a consequence, that the pleadings, not being directed by law to be different, were necessarily to be the same, on both trials. If the law required the plaintiff below to be pre- sent, at the delivery of the verdict; if it would not allow his final condemnation when he did not appear and offer evidence, in the inferior court, nothing could authorize, the superior to deviate from the usual mode of proceeding-any other would be arbitrary.
We have already traced the progress of the first suit instituted by the appellee, for the re- covery of his freedom, down to the judgment of non-suit rendered in the district court, which, in the present action, he insists, is a dereliction of the appeal from the judgment originally given in his favor, in the parish court; this court is of a different opinion.
It is believed that, according to the *283 of tribunals governed by the general principles of the civil law, in cases of appeal, it is necessary, before a judgment can have the force and effect of the thing judged, that certain measures should be pursued by the party claiming the benefit of it, to have the appeal declared to be abandoned by the appellant. Far from any step of this nature having been taken in this case, it is seen that the appellant was present, urging the trial of his cause, and that the judgment of the district court was the consequence of the latches of the appellee, who, as has been already shewn, was bound to prosecute and make out his case, as upon a new trial. The judgment of non-suit was given in favor of the appellant, the original defendant, and now so to construe it, as to make it destructive of his right, would certainly be absurd and unjust.
Being of opinion that the claim of the present plaintiff and appellant to freedom is not supported by the judgment of the parish court as res judicata, it remains for us to examine his pretentions to it by birth.
II. His counsel contends that the decision of the cause must be according to the rules of the Spanish system of laws. According to these laws, it is clear that since the famous regulations *284 of Charles V. made about the middle of the fifteenth century. Indians could not be reduced to slavery, and if the case was to be decided by them, he would certainly be entitled to his freedom. But on the other side, it is contended that this court ought to be governed in the determination of this suit, by the municipal laws and usages of France, by which her American colonies were ruled. On this previous question, our opinion is in favor of the defendant and appellee. It is true that the province of Louisiana was ceded by France, to Spain in 1763, by a secret treaty, but no effectual possession of the country was taken, until the arrival of governor O'Reilly in 1769. Now, it is an incontrovertible principle of the laws of nations, that in cases of the cession of any part of the dominions of one sovereign power to another, the inhabitants of the part ceded, retain their ancient municipal regulations, until they are abrogated by some act of their new sovereign. In relation to the colony of Louisiana, nothing ending to repeal its former laws, such as they were under the French government, took place till the year 1769, and we have already seen, that the Indian woman, the ancestor of the plaintiff, was brought into the country, and sold as a slave in the year 1765 or 1766. 1783 or 1786.
*285 Slavery, notwithstanding all that may have been said and written against it, as being unjust, arbitrary and contrary to the laws of human nature, we find in history, to have existed from the earliest ages of the world, down to the present day.
In investigating the rights of the parties, now before the court, it is deemed unnecessary to inquire into the different means, by which one part of the human race have, in all ages, become the bondsmen of the other, such as captivity, being the offspring of those already enslaved, &c. However, we are of opinion, that it may be laid down as a legal axiom, that in all governments, in which the municipal regulations are not absolutely opposed to slavery, persons, already reduced to that state, may be held in it, and we also assume it, as a first principle, that slavery has been permitted and tolerated, in all the colonies established in America, by European powers-most clearly as relates to the blacks or Africans, and also in relation to Indians, in the first periods of conquest and colonization. Taking this principle for granted, it accounts in some measure, for the absence of any legislative act of the European powers, for the introduction of slavery into their American dominions. If the record of any such act ex *286 ist, we have not been able to find any trace of it. It is true that Charles the fifth, in the first part of the sixteenth century, granted a patent, to one of his Flemish favourites, for the exclusive right of importing four thousand negroes into America, which was purchased by some Genoese merchants, who were the first, who brought into a regular form, the commerce for slaves between Africa and America. A few years before, a small number of negroes had been introduced by the permission of Ferdinand. But the priviledge. granted by the Emperor, so far from being the first introduction of slavery into the new world, was intended as a means of enabling the planters to dispense with the slavery of the Indians, who had been reduced to a state of bondage, by their European conquerors. A full account of these transactions may be seen in Robertson's history of America.
On turning our attention to the first settlement of the British colonies in America, we find that the introduction of negro slaves, into one of the most important, was accidental. In the year 1616, as stated by Robertson, and 1620, by Judge Marshal, in his life of Washington, a Dutch ship from the coast of Guinea, sold a part of her cargo of negroes to the planters on James river. This is the first origin of *287 the slavery of the blacks, in the British American provinces. About twenty years after, slaves were introduced into New England. All this took place, without any previous legislative act on the subject: and it is believed that Indians were at the same time, and before, held in bondage. The absence of any act, or instrument of government, under which their slavery originated, is not a matter of greater surprise, than that there should be none found, authorizing the slavery of the blacks.
The first act of the legislature of the province of Virginia, on the subject of the slavery of the Indians, was passed in 1670, and one of its provisions, as we are informed by Judge Tucker, prohibits free or manumitted Indians from purchasing christian servants.The words, free or manumitted, are useless and absurd, if there did not exist Indians in slavery, and Indians who had been slaves, and had been manumitted, before, and at the time this act was passed, indeed from the history, and legislative proceedings of the British colonies, both in the West India islands and in North America, it clearly appears, that in most, if not in all of them, the slavery of the Indians was tolerated by government, in the early peri *288 ods of their settlement, without any specific legislation on that subject.
The French government was later, in establishing colonies in America, than the British and Spanish. In our researches, on the subject under consideration, we have not been able to discover any legislative act of it, by which the colonies were authorised to hold Indians in bondage, but that it was customary to purchase and hold some classes of them in slavery cannot be doubted. This cannot have been without the permission, or at least the toleration of government. Moreau de St. Mery, speaking of the black population of St. Domingo, observes, that among it are the descendants of some Indians from Guiana, Louisiana, &c. whom government and individuals, in violation of the law of nature, deemed it profitable to reduce to slavery. 1 Hist. St. Dom. 67. In the beginning of the eighteenth century, he adds, there were upwards of three hundred Indian slaves, in the French part of St. Domingo. In 1730, the governor of Louisiana, sent three hun-deed of the Natchez tribe to be sold. Several arrived after that period from Canada and Louisiana.
Here, we have historical facts, establishing beyond contradiction, the holding of Indians *289 as slaves in one of the French colonies, many of whom were transported from the very colony, in which the ancestor of the plaintiff an appellant were held in bondage. Were it necessary to prove that they were legally held so, the evidence of it would be found, in their being taxed as slaves, 2 St. Domingo laws, 541; a circumstance, which creates at least a very violent presumption, that the municipaI regulations of the French colonies, did not prohibit the slavery of the Indians. This appears to have been the opinion of the Spanish government, which we have seen succeeded to the French in Louisiana. Governor O'Reilly, in 1769, on taking possession of the colony, discovered that a considerable number of Indians, were held in slavery, by the French colonists, This he declared, by a proclamation, to be contrary to the wise and pious laws of Spain: but by the same instrument, he confirmed the inhabitants in their possession of such Indian slaves, until the pleasure of the king, in this respect, could be known. Here is then a recognition of the right of the possessors, to hold their Indian slaves, until the legislative will of the monarch should deprive them of it. This never did happen. In conformity with this opinion, is a decree of the Baron de Carondelet, twenty five *290 years after, in 1794, by which he orders two Indians, Alexis and David, to return to, and abide with their owners, until the royal will was expressed to the contrary.
The inhabitants of the colony of Louisiana, while under the government and dominion of France, held Indians in slavery. The Spanish government, under which they passed, recognized their right to hold them, until it should be altered by a declaration of the king’s will. It never was declared. The colony, without any change in the condition of the original population, is receded to the French nation, and by it transferred to the United States, under a treaty securing to its inhabitants, their rights to property, as they stood under the former government. Throughout these political changes, the ancestor of the defendant and appellee, remained undisturbed in his possession, of the plaintiff and appellant’s mother, as his slave, and of him since his birth. It is true that, during the government of the Baron de Carondelet, the plaintiff’s mother, as has been stated, made an attempt to obtain her freedom : what proceedings took place before that governor, whether any, or what judgment was rendered, cannot now he ascertained. The only thing clear is, that she returned with the defen *291 dant's father from New-Orleans, and remained with him as his slave, until his death. This certainly raises a presumption, that the suit terminated in a manner unfavourable to her claim. If this is to have any weight on the determination of the present case, it must certainly be placed against the plaintiff.
Baldwin for the plaintiff, Brent for the defendant.
Upon the whole, we are of opinion, that neither from a view of the political changes in the country, nor a fair examination of the subject, is the plaintiff and appellant entitled to his freedom.
It, is, therefore, ordered, adjudged and decreed, that the judgment of the district court be affirmed.
*.*There was no ease determined during the months of October and November.

 Martin, J. did not join in this opinion, having been of counsel in the cause.