Martin, J.
delivered the opinion of the court. * The plaintiff claims a batture, which he alledges to have arisen in front of his land. The defendants pleaded the general issue ; and several other pleas and demurrers were inserted in the answer, but have been since abandoned. They further claim the batture under Jean Gra-vier, heir of Bertrand Gravier, from whom the plaintiff alledges that the land before which it has arisen, was purchased by J. B. Poeyfarré, under whom he claims.
As evidence of the title of Bertrand Gravier having passed to him, he introduces a notarial act, executed on the 27th of February, 1789, by Maria J. Delhonde and B. Gravier, her husband, for a trapezium of land, and another notarial act of the 30th of October, of the same year, by which Poeyfarré conveyed sixty feet in front, *216 with one hundred and eighty feet in depth, of the trapezium to P. Baiily, who, m the year 1816, it is admitted, conveyed his right thereto to the plaintiff.
Batture is, according to Richelet and the French academy, a marine term, and is used to denote a bottom of sand, stone or rock mixed together, and rising towards the surface of the water: its etymology is from the verb battre, to beat : because a batture is beaten by the water. In its grammatical sense, as a technical word, and we believe, in common parlance, it is then an elevation of the bed of a river, under the surface of the water, since it is rising towards it. It is, however, sometimes used to denote the same elevation of the bank, when it has arisen above the surface of the water, or is as high as the land on the outside of the bank
While this case was before the parish court,* the defendants endeavored to establish, that the batture, in dispute in the present case, existed, and was a batture of the latter kind ; a batture above the surface of the water: while the plain-iff’ endeavored to establish that there was no batture at all, or that if there was one, it was of *217 the former kind, viz : a batture under the surface of the water.
For this purpose, the defendants introduced a plan, of the trapezium acquired by Poeyfarré, annexed to his act of sale, in which a batture is marked before the trapezium, and the word bat-ture written thereon. They produced a plan of the plantation of the vendors of Poe) farré, under whom the defendants’ claim the batture, made on the 1st of April, 1778, in the front of which a batture is marked, extending along the whole plantation, of a considerable width in the upper part, but gradually narrowing towards the city, in which the trapezium is marked, so that it has there one fifth only in of width in the upper part ; where is written, large batture, •which the waters of the river cover in its utmost height.
The plaintiff offered witnesses, ancient inhabitants of the neighborhood, to disprove the existence and height of the bátture above the sur- . face of the water.
The defendants’ counsel resisted the introduction of this testimony, which was however received, and a bill of exceptions was taken to the opinion of the parish court in receiving it.
The plaintiff’s counsel contends, that the representation of a batture before the trapezium, on the plan referred to, is no conclusive evi- *218 (fence of its existence—that the plan is evl- , dence of the operations of the surveyor, but the batture was not the object of these—that it is usual with surveyors, in order to relieve the nakedness of their plans, to add neighbouring objects, introduced according to their fancy : but that it never was attempted to convert the exhibition of such objects, real or imaginary, into authentic evidence of their indisputable existence : and our attention has been drawn to groves, canals and a statue drawn on these plans, which it is evident never existed but on the paper.
The plaintiff alledged in his petition, that at the time of the sale to Poeyfarré, there existed no batture before the trapezium, or that if one existed, it was a batture under water : and the defendants having put him on the proof of all his allegations, the onus probandi lay on him as to the height of it at least ; and perhaps as negative propositions are not susceptible of proof ; the defendants were bound to prove that there was a batture. Admitting (what it is useless now to determine) that the plan is conclusive evidence, of the existence of a batture, it is no evidence of its being a batture above water. If neither of the parties had produced any other evidence than this plan, referred to in, and which the defendants’ counsel insists ought to be considered as *219 a part of, the act of sale, as the plan left it doubtful whether the batture was one above or under the surface of the water, the legal conclusion must have been that it was a batture under : because in the contract of sale, the rule is to interpret the words of the act against the vendor, in whose power and whose duty it was to use 'uC^ wo^ds as would leave no room for ⅛ -'O'jbt: ob-scuritas pacti potius nocet vendí*'" l-> P '^ul* re integra apertius dicere. JÍ- 18, f 21. Pothier Pandects, 1, 2, 14, no. 70. This distinction was not attended to in the case of Duncan vs. Cevallos’ executors, 4 Martin, 575.
But the defendants having introduced in evidence, a plan which Poeyfarré’s vendor is said to have caused to be made, nine months before the sale (without any proof of its genuineness or of its having been exhibited or known to the vendee) in order to shew that the batture was above the surface of the water, parol evidence, under oath, was certainly better evidence, and was admissible to rebut that which resulted from a paper the correctness or verity of which was not proved. Indeed it was in every case admissible, on the part of the plaintiff, to shew that the batture was under the surface of the water ; and the defendants’ counsel admits that he did not oppose its introduction to that effect.
We conclude, that the parish court did not *220 err jn receiving the testimony therefore ; and it properly makes a part of the evidence, on which the case- is to be heard in this court.
. Another bill of exceptions remains to be ais-i^sed of.
The 'v^rds frente al rio, in the act of sale to Poeyfarre, bes.^. contended by the plaintiff’s counsel, to be in toe general understanding of the country, not only testbed in common parlance, but universally in plots of survey and acts of sale, equivalent to the most explicit terms of boundary upon the river, and the defendants’ counsel denying that they were, surveyors were offered to be examined, which was opposed on the part of the defendants ; whereupon the parish court overruled the objection, and a bill of exception was taken.
As the words of a contract, like those of a law, are to be understood generally, in their most usual and known signification, and terms of art or technical terms and phrases according to their received meaning and acceptation with the learned in each art, trade or science—Cod. Civ. 4, art. 14 fc? 15, the parish court appears to us to have correctly overruled the objection. The same kind of evidence was admitted, to the same purpose, in the superior court of the late territory *221 of Orleans, in Gravier vs. Mayor and aldermen, &c. (see the report of that case, 17.)
From the testimony thus received, it appears, that Bruneau deposed, that he arrived here two years before the Spaniards, and is now 75 or 76 years of age; that there were about fifteen feet of water before Bailly’s lot, next to the levee, when Bailly went to live there, and being asked, from what circumstance he was able to speak so positively, answered, from that of a raft of wood which he brought there, drawing ten feet of water—that P. Bailly then kept the levee in repair, and Gravier did not interfere therein.
Caizergues, who has been an alcade under the Spanish government, deposed, that the bat-ture bf-gan to form itself, before the lot of the present plaintiff, about thirty years ago, 1788, a year before the sale to Poeyfarré.
On the second point, Mansuy Pelletier, a surveyor, deposed, that in original grants, concessions, or deeds of lands, bordering on the Mississippi, the expression face aujleuve is employ, ed to express the boundary on the river.
Tannesse, another surveyor, deposed, that in original grants or sales of lands, bordering on the Mississippi, the words face aufleuve are a well known and appropriate expression, employed to denote the boundary thereof unon the river.
*222 Jn some titles he has seen the words face, front ' J only employed for the same purpose.
Pilie, another surveyor, deposed also, that the words face au jleuve, or face only, are descriptive of an estate on the river.
In the deed to Poeyfarré, the premises sold are thus described —■“ A piece of land forming a trapezium, situated out of the Chapitoulas gate, consisting of 415 feet of land, frente al rio, front to the river, 186 feet in depth on the side of the city, 411 feet 8 inches on the side of the vendors’ garden, and on the back 229 feet 8 inches. The whole forms 2386 toises 4 feet and 6 inches of land in superficies, as appears by the plan of Don Carlos Trudeau, public surveyor, of the 9th instant, which the parties have signed, and which remains in the power of the vendee.”
In the deed from Poeyfarré to Bailly, the land sold is thus described—“ a lot of mine situated out of this city, consisting of 60 feet of front and 180 in depth, in conformity with the plan of Don Carlos Trudeau, public surveyor of the city, bounded on one side by a lot of the vendor, and on the other by one of B. Gravier, which lot belongs to me for having purchased it with a greater quantity of land from B. Gravier and Maria J. Delhonde, his wife,”
*223 The deed to the plaintiff from Bailly is not r . , produced, but is admitted to convey the all estate of the vendor.
On this the plaintiff rests his case, contending that he has shewn himself the proprietor of a riparious estate ; that an alluvion has been formed before it, of which he is consequently the owner.
The defendants’ counsel does not shew their title but contends the plaintiff has not shewn any.
It is said, that the expression front to the river, does no more give a right to go to it, than front to the north would extend the land to pole, nor thn the expression, 138 feet on the side of the city, would extend that side thereto.
This is attempted to be illustrated by supposing, that the trapezium had changed its position, so that the side next the city had become the front and that the boundary on that side was designated by the expression front to the city ; and the question is asked, whether it could be seriously contended that this would carry the grantee 700 feet beyond the trapezium ? To exemplify 1 this more thoroughly, a plan of the faubourg is presented, and the supposition is made, that the trapezium, instead of being on the side most distant from the river of the first street, parallel thereto, was on the same side of the second, *224 without any street being laid out between it and J ° the river ;—and the question is asked, whether the Vvords front to the river would carry the proprietor to it ? So that while, by the words of the deed, a piece of land (limited by certain and precise lines, which contain, and are said to contain, 2486 toices 4 feet and 6 inches square measure) was intended to be sold, one would pass which would have four times the length of lateral lines that had been expressed, and consequently four times the number of square toises which the deed says were conveyed.
There is nothing of magic or talismanic in the words front to the rive' ; but whenever they occur in a deed, it is the duty of those whose province it is to pronounce on the different modes in which the parties construe it, to take those words in their known signification. But, if in this way, they lead to none, or a very absurd result, to deviate a little from this received sense. —1 Black. Com. 60, 61.
From a very close examination of the books of the land office of the United States, which have been submitted to us, and the depositions of surveyors, examined in this case, it is clear that in French and Spanish conveyances, both public and private, the words face au fieuve, face, fren, te al rio, frente, front to the river, or front, exclusively designate estates bounded by the *225 river—which in the country are otherwise cal-1 _ led riparious, bound to the repair of the road, its diches, bridges and levees, and to supply ground for either or the whole of these, when that which they cover is carried away by the water, We are therefore bound to take the expression, frente al rio, in the deed, as evidence of the intention of one of the parties to convey, and of the other to acquire, a riparious estate ; unless, by taking it in this sense, we are led to an incongruous or absurd result.
Such was the opinion of the superior court of the late territory of Orleans, in the case cited, on nearly the same evidence.
If, instead of the expression front to the river, that of front to the north had been used, the absurdity of a piece of land, containing nearly 2400 toises, square measure, and lying in latitude 29, being deemed to extend to the north pole, would demand a deviation from the received sense of these words. So if the trapezium had been inverted, and the expression face to the city used, and it appeared that a line, which is described, as of 188 feet, must be extended 300 feet farther, to reach the city, so as to include four times the quantity of land, called for in the deed, susceptible of private ownership, we must have deviated from the received sense, in order to avoid falling into an absurd conclusion. But, if *226 -whole extent of erround, thus taken within the extended lines, beyond what was within their stated length, was public property, property out of commerce, it would matter but little, whether . . the expression were taken in one sense or the other, as the same quantity of land and no more would pass in either hypothesis, or if the whole intermediate space had been a commons, the property of the city, the words must have been understood front on the commons of the city. The construction would be the same in the other hypothesis.
We conclude that, on the inspection of the deed, it appears to us the words front to the river, used therein, were intended to denote a riparious estate bordering on the river.
The defendants’ counsel next presents to us as evidence of the intention of the parties, to give to the land conveyed another boundary, than the river, the existence of the batture between the river and the trapezium.
The existence of the batture, above the surface of the water, is disproved by the uncontradicted testimony of two antient inhabitants of an unim-peached character.
It is not to be presumed from the plan referred to in the deed.
*227 On this point, every tittle of evidence in the cause is against the defendants.
The opinion of the superior of the late territory of Orleans, already cited, is brought under our eyes by the defendants’ counsel, who expects to prove thereby, that the batture had risen above the surface of the water, at the time of the sale to Poeyfarré. We are of opinion that the record of a suit is only evidence of the facts, which appear thereby, between the parties. As to the rest of the world it is res inter alios acta ; it proves nothing. It would lead to the most dreadful consequences, if one could establish a fact, in a suit in which he was a party with A.in order to give the record in evidence in a suit between himself and B. This cannot be admitted even on the authority of Bishop Covarruvias. Yet, we have looked a the decision of the court, and if it could be read in evidence, it would be far from proving the fact which it is offered to establish, viz. that the batture before the trapezium, was a batture above the surface of the water, at the time oj the sale to Poeyfarré. For the decision of the superior court establishes another fact, viz : that, antecedent to the time, when Bertrand Gravier, ceased to be the proprietor of the land adjacent to the high road, a batture or alluvion had been formed adjoining to the levee in front of the faubourg upon the river ; that it was of a *228 efficient height to be considered as private property. Now, at the time of the sale to Poeyfarré, it does not appear that his vendors hacj yet parted with an inch of laud adjacent to the road
We conclude, that the existence of a batture above the surf tee of the water is not proved, and rather disproved by the plan, annexed to Poey-farré’s act of sale—that the plan, made by Lavau Trudeau for the vendors, nine months before the date of that act, is of no legal evidence in this cause, and that if it was, it does not prove the height of the batture above the surface of the water ; that the decision of the superior court cited, is not legal evidence against the plaintiff, who was not a party thereto ; and that if it was, it proves nothing as to the height of the batture at the date of the sale. Finally, that the uncon-tradicted testimony of two wit nesses proves that the premises in dispute did not exist, as a bat-ture above the water, when Poeyfarre acquired the trapezium of land before which it stands, and therefore that no proof results (as is contended by the defendants’ counsel) from the batture, of an intention in the parties to gh e to the land sold, another boundary than the river.
One is presented to us in the existence of the levee between the trapezium and the river.
*229 B. Gravier, under whom both parties claim ... the batture, in his plan of the faubourg, introduced as evidence in this case, calls the levee a dike or mound, containing the waters of the river in its utmost height, a real, though not a natural bank.
The bank of a river is defined to be that which contains the river in its utmost height; ripa autem dejinitur id quod fumen continet ff. 43, 12, 1 6,— Ripa putatur esse quae pie nissimum fumen continet. 1. pen. eod. tit. 1. The bank is part of the river. Tribus constant fiumina, aqua, álveo £s? ripis. ff. 43, 12, 1, § 1 no 2.
The bank is that space which the water covers when the river is highest in any season of the year. La ribera se entiende todo quanto cubre el agua del rio guando mas crece in qualquiero tiempo del ano. 3 Cur. Phil, ill. cap. 1. sec. 2, Ribera, no. 112
The levee then, as well as the batture, under the surface of the water, is a part of the bank, and the bank is a part of the river, which consists of three things, the water, the bed and the bank. If these two objects, the levee and the batture, form a part of the river, they do not exist beyond the river, and consequently not between the river and the trapezium.
We cannot therefore give our assent to the proposition of the defendants’ counsel, that the exis *230 tence of the levee between the trapezium and the river, is a proof of the intention of the parties, that the land sold should have another boundary than the river ; because we are of opinion that the levee did not so exist.
The intervention of the public road, the counsel for the defendant contends, is a proof of such an intention.
If the trapezium had been immediately on the river, and no road had intervened, the qualified property which riparious owners have in the banks, before their fields, would have passed to Poeyfarré, as an accessory of the trapezium ; because, in the sale of a field, the sale of the bank, is understood as a part or accessory of the field. En la venta del fundo se entiende vendida Ja ribera como parte de el; si se vende el fundo que esta immediato a la ribera, también se en. cluye como appendice del mismo fundo. 3 Cur. Ph. ill. loco citato, no. 113.
The banks of the river are not sold, but rather pass as an accessory of the land sold. Ripee non venduntur, sed magis accedunt rei venditee, Caepola de serv. rust. The property of the banks belongs to those whose fields they are contiguous. Proprietas earum friparum) est quorum, preediis harent. ff. 1, 8, 5, Code Civil, 96, art, 8. They must be the property of the riparious own» *231 ers. without being included or mentioned in ' ° # their grants, for if they were only when included there would be no use for the provision in the law ; it would be idle.
1 • If, therefore, when the sovereign grants land, contiguous to the river, without mentioning the bank, this passes, it must do so as an an accessory—If the bank pass as an accessory in the grant of the sovereign, it must also in the deeds of private persons.
The bank passes with the field, even when there is an intervening public road. Ripa cedit fundo, 1. riparum ff. rer. divis. Inst. eod. tit. ub. gloss, dicit verum si via est media. Ripee respectu proprietatis sunt illorum quorum prsediis hasrent, sed quid si via esset in medio, inter-flumen et agrum vel domum ? Responde idem ut ripee sunt eorum. Ceepola, tract. 11. de serv: rust. cap. 26, in ripa.
If there be a public road between a field and the river, still that which is made by alluvion accrues to the field. Si meum inter agrum et fluvium interjaceat publica via, tamen meum fieri quod alluvio adjicit. Grot, de jur. bell, et pa. 2, 8, 17. Gronovii nota, 68.
But the defendants’ counsel urges, that this must be understood of a private road—one of which the soil belongs to the owner of the field, and is burthened with a right of way, and he re *232 fers us to the law, Attius. if. 41, 1, 38, and t6 _ *i/ . ’ ’ ’ Grotius, who holds that there is no principle of natural law which justifies the position that the owners of estates, separated by a public road from the river, have a right to alluvion, and admits that the field has the alluvion, if it be a private one, which owes a road, quiviam debeat. Grotius dej. b. etp. 2, 8, 17, so that the soil of the road be the property of the riparious owner.
The expression, used by the writers whom Grotius condemns, is via publica, a public road.
A public road is that of which even the soil is public ; it is not in a public road as in a private one, the soil of which does net belong to the public, while we have only the right of walking and driving over it; the soil of a public road is public.— Viam publicam earn dicimus cujus etiam solum publicum est, non sicuti in privata via ita esse in publica accipimus : viaa privata*, solum alienum est. Jus tantum eundi et agendi nobis competit : vi¿e autem publicas, solum pub-licum est.^" 43, 8, 2, § 21.
Gronovius, a learned commentator of Grotius, construes this debt of a road, of which his author speaks, to be an obligation to repair the road and protect it by embankments. Nisi domino agri istius vite muniendse et reficiendae munus in-cumbat. Grot. j. b. etp. Gronovii nota, $7.
*233 Here the burthen of repairing: the road and . . . . , 3 , protecting it by a levee is a charge upon the trapezium.
We conclude, that in the present case the intervention of the public road, between the trapezium and the river, cannot be considered as a proof of the intention of the parties to give the land conveyed another boundary than the river.
Our attention is next drawn to the lateral lines df the plan referred to in the deed, and vve are desired to notice that tlv y stop at the road, and are not continued through the road, levee and batture, as is said to be ordinarily done, when the land conveyed extends to the river We are of opinion that the lines of a plan, especially one made to ascertain the quantity of land sold, ought only to include the ground which is measured, and not the public road, nor the levee, bank, or bat-ture under the surface of the water, which pass as an accessory to a riparious field : this need not be surveyed Littora et via publica non men-surantur cum re vendita. Ctepola de serv. rus. loco citato.
If the parties to the deed to Poeyfarré meant that a riparious estate should pass, their intention might be carried into effect, by conveying as far as the river by express words, or by conveying every thing susceptible of absolute pri *234 vate ownership between the line of the trapezium * K most distant from its front and parallel to the river, till the bank. In the present case both methods appear to have been adopted. The land is sold, front to the river ; an expression which, in the general understanding of the country, is equivalent to the most explicit terms of a boundary on the river ; and it does not appear that the vendors, who, by the pleadings are admitted by both parties (since they both claim under them) to have been riparious owners, have retained any part of the ground between the trapezium and the river.
Another circumstance is relied on by the counsel for the defendants as a proof of the intention of the parties to give to the land conveyed another boundary than the river, viz : that the vendor, prior to the sale, caused a plan to be made for the division of his land into town lots, of which the trapezium in question formed one, and is particularly referred to in the margin of' the plan, as being to be sold, as it then stood, with its fence.
Of this fact there is no legal evidence ; such a plan was indeed produced, with a date anterior to Poeyfarré’s deed, and from no circumstance can it be inferred, that the vendee ever had the least knowledge of this plan, nor the *235 least intimation of the intention of the vendors, . , # of which it is said to be evidence.
Admitting it, however, to prove such an inten. tion in the vendors, would such a latent intention suffice to infer the necessary concurrence of the vendee ? Had the sale been that of a lot, according to a known plan, would not some part of the deed have referred to it ? The shape of the trapezium, aukward and incongruous in the plan of a town, repels the idea that it was shaped with a view of its being a town lot. It was apparently a field of an irregular and accidental shape, of several arpents of superficies.
Conceding, however, every thing that seems to be asked, let us enquire whether, even if the trapezium had been sold as a lot of an intended faubourg or town, the same consequences would not have followed.
Under the Spanish government, no town or city seems to have been erected by legal authority ; that of New-Orleans was the only one that existed. It is true that in it the owners of the lots, nearest to the river, have no part of the bank as accessory thereto. These lots are not charged with any of the burthens attending rural riparious estates : the levee, road or street were made and kept in repair at the joint expense of the owner of every lot in the city. The farthest from the water contributing as much thereto as *236 nearest ; no riparious duties are imposed on r 1 a lot in New-Orleans, either by the law or any clause in its gruit. Not so, with regard to rural estates ; the law and a clause in the original grant burthen those contiguous to the river-, with the confection and the repair of a road, its ditches and bridges, and the levee If any part of the soil which is covered by these, be carried away by the stream, the riparious estate must yield a quantity of land equal thereto The bank of the river is to them alternately an one. rous and a beneficial accessory. Riparum incom-moda pertinent ad vicinos : si modo ripae latiores Hunt, ergo secundum naturam est ut commoda et incommoda sequantur eos. Caspóla, tract, 2, c. 26, no. 10.
On the morning of the day on which Bertrand Gravier sent for a surveyor, to make a plan of his plantation into lots and streets, the land covered by it was rural property, burthened with riparious duties in his hands, and when the plan was finished, by the division into lots and streets, no alteration was wrought in these burthens. When, nine mmths after, Poeyfarré purchased the trapezium, he purchased a rural estate, bur. thened with riparious duties ; having the portion of the bank of the river before it as an accessory. The sale discharged the vendor from, and imposed on the vendee, the duties of repairing the road *237 and levee alone: the land conveyed. If any part of this portion of the road had beén found out of repair, the syndic of the district would have compelled the vendee to repair it, without the least enquire into the circumstance, whether his deed bounded him on the road or on the river ; if he was really owner of the land and separated !rom the river by the road only. The banks of the river, opposite to the trapezium, passu.g to the vendee cum onere, must have passed cum commodo ; for it is according to natural law, that the advantages of every thing should belong to him who bears its burthen. Secundum naturam est com-moda cujusque eum sequi quera sequuntur in-commoda. ff. 50 17, 1.
Had every lot in the faubourg been sold, the liability of the land, which they covered, would have continued the same. Whether the ripanous burthens be considered as imposed by a clause in the grant of the land, or by law, the proprietor could not get rid of them, in the first case, without the approbation of the grantor; in the second without an act of the legislator.
It is true the vendor had retained the land behind the trapezium, and might, in the event of che road and trapezium being carried awaj by the water, become liable to suffer as riparious owner :—■ but, as appears by the law Attius, when the field of Titius and the road which separated Attius’s *238 fieij fr0m the river, were carried away, Attius be. . came entitled to any increase or loss that would then attend the contiguity of the river. But, as long as the trapezium stood, it would be the only estate susceptible of being diminished or increased as the riparious estate.—Neither could Poeyfarre have compelled his vendor to indemnify him for, orto contribute to, the labors or expense of keeping up the levee or repairing the road. Indeed the vendors were under no moral obligation to share in the labor or expense—neither was there any in the vendee to share with them any increase of land, which the situation of his property might procure.
The calculation of the contents of the trapezium does not offer any proof of an intention in the parties to Poeyfarré’s deed, to give to the land conveyed any other boundary than the river.
Almost every tract of land on the Mississippi is granted by a description of its contents; so many acres in front on so many in depth; a tract described by ten arpents in front and forty in depth, is a tract of four hundred arpents, square measure, if its line be parallel and rectangular; if they be not so, the bearings give a clue by which the contents are to be ascertained, and, inlaw, id cerium est quod cerium reddi potest.
The reference in the deed to the plan, does not *239 afford any proof of an intention in the parties to the deed to give another boundary than the river. For the plan itself, if it be referred to, does not contra-diet the deed : were both the words ‘ front to the river’ and c front to the road’ omitted, yet the deed and plan would present to the mind the idea of a riparious estate. For, whether the boundary be the river or the road, the quantity of land convejed is precisely. the same, lies precisely in the same manner, is precisely alike bound to sustain the riparious burthens, and in either case the whole estate of the vendors, as riparious owners, passes with regard to the trapezium.
Further, the deed does not refer to the plan for any thing else except the quantity of land sold. It begins by describing the premises ; this being done, a second phrase begins, “The whole forms, &c. “ as is shewn”—The phrase is perfectly grammatical and complete without implying a reference to the plan for any thing else besides the contents of the trapezium.
Taking both the plan and deed together, the expressions ‘ front to the river’ in the deed, and ‘ front to the road’ in the plan, are not at all contradictory, and if they were and left any doubt, it would be our duty in construing it, to adopt the construction most favorable to the vendee.
Upon the whole, the result of our examination of the deed and plan, with the objections stated *240 by ⅛6 defendants’ counsel, is a conviction that J # ⅜ Gravier and wife did not retain any property between the trapezium and the water, and so the bank of the river opposite to the trapezium pass* ed to Poeyfarré as an appendage or accessory to it.
But the defendants alledge that although Poey-farré may have acquired a riparious estate, he did not convey such a one to Bailly.
Poeyiasre here conveys a lot ‘‘situated out of this ci v, composed of sixty "feet in front and 188 in depth, couformahl. to the figu> ative plan of Don Carlos Lavrau Trudeau, public surveyor of this city, bounded on one side by a lot of the vendor, on the other by one of Bertrand Gravier, which belongs to me, for having purchased it with a larger one from Don B. Gravier and wife,” &?c. referring to his own deed.
Now the surveyors inform us, that in conveyances of land on the Mississippi, the word front is used indifferently with the words front to the river, and we have seen that the latter are equivalent to the most explicit terms of boundary on the river. The lot is described as making part of a larger, bought by the vendor from B. Gravier and wife, which by the date appears to be the trapezium.
The impression on our minds is irresistible, that Poeyfarré sold to Bailly, as he had himself purchased from Gravier, a riparious estate ; one *241 bounded by the river, or separated only by the public road.
Lastly, the defendants’ counsel contends that neither Poeyfarré nor Bailly did acquire an estate with the right of alluvion, but an ager limitatus.
As both parties, according to the pleadings, claim the batture under Bertrand Gravier, either must be precluded from denying that the plantation of which the trapezium made a part, before the sale to Poeyfarré, was a riparious estate, entitled to the benefit of any alluvion that might be formed before it.
Poeyfarré bought the trapezium, with all its rights expressly, con todos sus derechos. If the right of alluvion was one of these, why did it not pass ? We are answered : because the trapezium was a limited field, ager limitatus.
The defendants’ counsel contends that the law of alluvion is not founded on principles of conpen-sation and to be supported on the maxim, qui sen-tit et onus debet sentiré et commodum, but that the riparious owner is entitled to the profit, because from the nature of the increase, it is impossible for any one else to claim it. He illustrates his position by the doctrine of avulsions, when a distinguishable piece of ground is at once taken from a field and added to another. Grotius is the only authority, in support of the position of the defen- *242 ¿[ants’ counsel in this respect. His commentators . . 1 _ do not adopt his opinion. But the current ox authorities in ancient and modern times supports the position of the plaintiff's counsel. When the land removed from a field to another is discernible, the principles that no one ought to enrich himself at the expense of another, neminem opportet alterius damno locupletari, or that he who seeks to avoid a loss, certat de damno vitando, is to be favored before him, who seeks to make a profit, qui certat de lucro captando, are clearly applicable ; and justice requires that the sufferer should recover his property, before the law should give it to another. But when the loser cannot possibly be ascertained, every principle of natural law demands, that he, .who is exposed to the loss, should reap the casual advantage, before the fisc, who ought not to be enriched by the misfortune of individuals, or before the first occupant, in order to avoid as much as possible that contention and strife which would result, if the law did not assign an owner to every thing susceptible of ownership.
Alluvion is a mode of acquiring property by natural law, jure gentium, by those principles or maxims which regulated the conduct of men, before the formation of civil society. Quod per al-luvionem agro nostro adjicitur, jure gentium nobis acquiritur Inst.
The Roman jurists, as Grotius informs us, *243 proved this to be a natural right, from the maxim it is just that the advantages of any thing should belong to him who supports its disadvantages. fium sequantur commoda, &c. L 20, ff. 2. de reg. jur. Grotius de j. b. Es?p. 2, 8, 16.
This opinion of the Roman jurists seems to prevail in France. “ Equity, says Brillon, requires that he who suffers the incommodity, should reap the advantages. As nothing is more prejudicial than the vicinity of a river, which inundates, submerges, and deteriorates the neighboring fields, nothing is more just than that the proprietor, to whom the stream has often borne prejudice, should conserve, in exclusion to all others, when it becomes beneficent, a gift, less a gain than a reparation, less a present than an exchange.” 4. Nouv. diction, de Brillon, 278.
The right of increase by alluvion is grounded on the maxim of law which bestows the profit and advantages of a thing upon him who is exposed to suffer its damages and losses. Dictionaire de Jurtsp. Encyclop. vo. alluvion,
Inasmuch as the adjoining fields frequently suffer great damages from rivers, by floods, because the increments we speak of, advancing by slow degrees, seem to be of little consequence to public revenue, many governments have thought it a reasonable favor and bounty to grant these im *244 Provements to the persons on whose lands they happen to fall. Puff law of nat. andnat. 4, 8, 12.
jn Jtaiys alluvion is supposed to have been granted to the riparious owners for the same reason. The inconveniences of rivers are borne by ripa-rious owners : if their banks are increased, it is just, according to natural law, that they should have both the advantage and disadvantage. Riparian incommoda pertinent ad vicinos, si modo ripie latieres fiunt, ergo secundum naturam est ut com-moda et incommoda sequantur eosdem. Capola, 2 Tract, de se. v. rust. c. 26, de ripa, 11, 10.
So, likewise in England. As to land gained from the sea by alluvion, by the washing up of sand and earth, so as a in time to make terra firma or by dereliction, as when the sea shrinks back below the usual water mark ; in these cases the law is held to be that, if this be by little and little, it shall go to the owner of the land adjoining: for de minimis non curat lex: and, besides these owners being often losers by its breaking up and at charges to keep it up, this possible gain is therefore a reciprocal consideration for such possible charge and loss 2 Black. com. 262.
In Spain, a positive law has been passed on the subject. “ Rivers swell sometimes, so that they take away and diminish from the inheritances that are situated on their banks and the}' give to and increase others which are situated on the op *245 posite side. Therefore, we say that whatever is carried off, by little and little, so that the quantity cannot be perceived, because it is not taken off in a body, this shall be gained by the owner of , , , , , , , , the inheritance to which it is added and those from whom it may have been taken shall have nothing to see therein.” Part. 3, 28, 2$.
Lastly, the defendants’ counsel urges that whatever may be the right of the plaintiff, in tlie batture or alluvion, he is excluded therefrom by the law in agris. The words of this law are, “ it is apparent that the right of alluvion does not take place in limited fields. Divus Pius has ordered it so ; and Trebatius says that a field, taken from the enemy and granted on the condition that it should be the property of a city, has the alluvion and is not limited ; but that the field, which, since it was taken, has been limited, in order that it might be known what was given to any one, what was sold, and what remained to the public, has not the right of alluvion.”^! 41, 1, 16.
This Roman law appears to us an evident modification of, an exception to, natural law, introduced by positive statute. In the first part, we are referred to a constitution of the emperor and as to what is given to us, under the authority of Trebatius, it is evidently introduced also by a *246 positive statute, for it refers wholly to military 1 ... J land, assigned to soldiers. It is impossible to see> Upon what moral principle, an exception to their disadvantage should be made to the natural law, as it stood in regard to the rest of the community. The rapacity of the fisc made likely the first attempt on the pittance of the soldier, and xhe way being- thus paved, a succeeding prince extended this modification of the law of nature to every case of a limited field.
In Spain, the Roman law has no intrinsic force. So much of it as has been drawn from the law of nature is followed, not because Roman legislators have ordered it, by appropriating it to themselves, but because the principles of natural law are binding on all men. That part of the Roman law which is positive, and has been confirmed by the laws of Spain, alone is in force ; what has been abrogated cannot be binding, and that which has been passed over is not law, because the Roman law, jus Romanum, is generally abrogated in Spain. Ordinances reales 1, 4, 1—Leyes de Toro 1—Nueva recop. 2, 1, 3, Recop. 1, 7.
Rut the defendants’ counsel has drawn ouf attention to Rodriguez’s digest; the laws of the Fuero real; the Cur. Phil. ¡Ilustrada and Cova-ruvias.
Rodriguez, in his translation of the digest, adds the following note to the law in agris. The *247 right of alluvion, of which the paragraph of the institute and the title of the partidas speak, does not take place in lands which were assigned to soldiers,
The editors of the Fuero real add the following note, to the part of the text in which an island, rising in the middle of the river, is said to belong to the owner of the riparious estate on each side. “But Azo, in summa inst. de rer. div. § Ilabet etiam locum, understands what is here said, as to this mode of acquiring property, as to unlimited fields ; if they be limited they do not acquire any part of the island on account of their vicinity, jf. de jhim. L 1, ⅜ insul.” Now, the author referred to by these editors, as holding that limited fields have not the right of alluvion, Pon-tius Azo was an Italian jurist, who flourished in Bologna about the year 1290, and died in 1320 (Lampriere's Dictionary J and who consequently cannot aid much in construing the partidas of Spain, first published nearly two centuries after his death.
If these learned editors had no other ground to conclude that the law in agris is in force in Spain, they cannot command much of our attention. If they had other reasons and did not express them, the consequence must be nearly the same.
The author of the Cur. Phil, illus. in the part *248 referred to by the defendants’ counsel, is inquiring whether the boundary of territories, districts or parishes, follow the changes of a river. He cites, indeed, all the authors enumerated by the defendants’ counsel, but the principal reason presented, seems to be that, owing to the nature of their boundaries or mounds, this is impracticable : attendida la calidad de los términos o mo-jones de su natura immovibles : esto es impracticable. Of the authors there cited, Peregrinus and Tonduti, only speak of the law in agris and neither of these is a Spanish jurist. We have in vain sought, in the part of this book quoted, for the author’s express decision of the question that by the laws of Spain, the bounds of agri limitati are not changed by alluvion. 3 Curia Phil illust. 45, no. 95.
Covarruvias is examining nearly the same question, viz : the extention of the boundary of a city and determines against it. The learned bishop, indeed refers to the law in agris.
Were it necessary, in the present case, to determine whether the law in agris is in force in Spain, we would not deem ourselves authorised to say so, on the authorities produced by the defendants’ counsel. We would rather think with the plaintiff’s that, as the Roman law can only be resorted to in Spanish tribunals, as to a system of ethics, illustrative of the natural law. the law in *249 agris, which is an exception and encroachment ® . * on natural law, is one of the last parts of the corpus juris civilis, which is to afford to a Spanish tribunal a legitimate rule ; as it appears to us diametrically opposed to the positive institutions of Spain.
This subject should have passed unnoticed by us, if we had not deemed it proper, in the present case, to express an opinion upon every point stated at the bar.
Admitting the law in agris to be in force in this country, it appears to us that the present case does not come within it.
The land is expressly sold with a boundary on the river and though its contents are calculated and stated, yet it is sold per aversionem, not ad tnensuram ; that is to say, in the gross and not by the measure, or so much the acre.
Those to whom fields are granted as far as the river (an expression equivalent to the one face au fleuve, front to the river) enjoy the right of alluvion, as well as those who possess fields without limits. lilis quibus agri sunt concessi usque ad jlumen jure alluvionis gaudent, tanquam possiden-tcs agros non limitatos. Voet, 605, no. 16.
A nation may assign its land to individuals, with the rights attending it in its hands, that is to say, so that they be bounded by the river, in *250 case riparious owners enjoy the right of alluvion. This was determined several centum ries ago in Holland, in regard to certain fields on the Meuse and Iser, because in deeds and . grants on record it appeared, it was always said they were bounded by the river.
Fieri posse ut populus agrum assignaret, eo jure quo ipse occupaverat, id est, ad fluraen us-que, et si id appareat jus esse alluvionis : quod in Hollandia, ante sécula aliquot, júdicatum est de agris ad Mosaniet Isam sitis, quia et in literis mancipationis et in libris annalibus semper died erant ad flumen attingere. Grot, de j. b. et p. 28, 12, no 2.
When such fields are sold, although in the contract of sale some mensuration is expressed, provided they be not sold by the measure (at so much an acre) but in the gross, they retain their nature and the right of alluvion, which was the case by the Roman law and is every where observed.
Et tales agri si vendentur, quamvis in lege emptionis mensura aliqua nominata fuerit, dum-modo non vendentur ad mensurara, sed sui cor^ . poris nomine, naturam suam et jus alluvionis re-tinent, quod Romanis quoque legibus proditum est et passim usurpatur. Grotius, dej.b. et p, loco citato.
Grotius refers us to ff. 19, 1, 13, § 13, in which w® see that the alluvion is enjoyed by a field ex *251 pressly sold, as of a given quantity of land; cen-turn juggera.
After a most close and minute examination of all the arguments and authorities, offered by the counsel of the defendants, we conclude :
1.That the land sold by Gravier and wife de facto extended to the river, as much as any tract on the Mississippi extends thereto, which has not been created by alluvion since the original grant; that the batture, existing then as batture under the surface of the water, was, as well as the levee a part of the bank, and the bank being part of the river, neither can be said to be without it or between it and another object : that the intervention of a public road does not prevent the owner of an estate, which it separates from the river, from having an interest in the bank and enjoy the alluvion, as well as he whose estate is washed by the river.
2. That the land sold is not what is technically called a limited field, ager limitatus. Front any thing that appears, it was sold in gross and not by the arpent, toise, or foot.
3. That the bank, including the levee and bat. ture, such as it is proven to have been, passed to Poeyfarré as an accessory to the land conveyed.
4. That Bailly acquired from Poeyfarré all his estate, in the part of the land sold to the fori tr.
*252 That Bailly, as is admitted, conveyed to the plaintiff all his estate in what he purchased front, Poeyfarré ; and it appears that he took possession of his lot and repaired the levee. And there is no ... allegation in the pleadings, nor any evidence that the right sp transferred was a litigious one.
It is, therefore, ordered, adjudged and decreed, that the judgment, of the parish court be annulled, avoided and reversed; and this court proceeding to give such a judgment as in their opinion ought to have been given below, do order, adjudge and decree, that the plaintiff be declared the lawful proprietor of the alluvion, or batture, now ex* isting in front of the lot of ground he purchased of P. Bailly ; and that the defendants be perpetually enjoined not to disturb or injure his right and title thereto ; and that he may be henceforth quieted therein. And it is ordered that the defend., ants pay costs in both courts.
On the day after the judgment was pronounced, Duncan, for the defendants, read a petition, praying that the judgment might be declared null and void, on the ground of its having been pronounce ed more than fifteen days after the close of the argument. He relied on the fourth section of the act ■of 1813, oh. 47, which provides that “ in no case *253 shall they (the supreme court) delay more than fifteen days the pronouncing of'their judgments. 2 Martin's Digest, 144, n. 7.
The court refused to receive the petition,stat. ing that the judgment had not yet passed in reni judicatam and the case might be reheard, if good reasons were shewn, on the application of either party, under the general rule of March term, 1814, 3 Martin, 280, That it was doubtful, whether the recourse of nullity against final judgments of any court, as it prevailed, under the Spanish go? vernment, before the court rendering the judgment, was still a part of the judiciary system of the states—that, admitting that it was, such a recourse was not allowed, in Spain, in regard to judgments of courts of dernier resort. Meeker's assignees vs. Williamson & al. syndics, 4 Martin, 625, Williamson & al. vs. their creditors, 5 id. 618, Recopilacion, 4, 17, 4.—That, if this recourse still existed, it was to be sought in a distinct suit, the adverse party being served with a copy of the petition and cited.—That the court had often found it impossible to come to a determination, till after a fortnight from the close of the argument—that, in a particular case, in the western district, Seville vs. Chretien, the court being composed of two judges only, the junior one having {jeen of counsel in it, found it impossible to come *254 ío a determination* without consulting authorities not within their reach at Opelousas, and the judgment was accordingly postponed till the following year—that, in such cases, the court thought it their bounden duty to pronounce, as soon as possible, after they had formed an opinion—that the opportunity was, however, always afforded to counsel who imagined that their arguments might have been forgotten, to be heard—an opportunity which, in this case, was offered, and of which the counsel thought it needless to avail themselves.*
*255 When the delay fixed by the general rule for the application for a rehearing was nearly expired, Livingston, for the defendants, prayed for an extension of it, stating that various causes and among them his indisposition had prevented him from attending to the draft of a petition, for a rehearing.
Whereupon the delay was extended till the end of a week, and a longer time was offered, if thought necessary. Before the expiration of it,
Livingston, for the defendants, prayed for a rehearing on the following grounds : *
1. That the court hate referred in their judgment to a number of authorities, which counsel believes can be rebutted by others,
2. That the court gave an incorrect definition and etymology of the word batture.
3. That the court, in the definition of the bank of a river, did not attend to the exception in cases in which it goes over its bank—sale de su madre.
*256 4. That the court overlooked the testimony of* Bourgeois, who deposed that the plan of the fau-bourg produced, came out of the archives of the archives of the city, and so ought to have been considered as an authentic document.
REHEARING REFUSED,

 Derbignt, J. did not join in this opinion, having' been consulted, in the case, while at the bar.

 This case has been erroneously stated, in the beginning ot ⅝ ⅛ be an appeal from the court of the first district

 The argument in court began on the 12th, and was concluded on the 25th of May. The judges took no note, being informed that each party would furnish a written argument, containing a note of all his authorities. Several days after the close of the oral argument, the defendants’ counsel handed his, which was immediately transmitted to the adverse counsel—a reply was prepared by the latter, and on its be' :ng handed was sent to the defendants’ counsel. On its being returned the judges began the consideration of the case, but the adjournment pf the court, in the eastern district, took place without their having been able to come to a satisfactory result. The counsel asked and were permitted to resume their respective arguments ancj that of the plaintiff employed the vacation in extending his researches, and on the opening of the court, in the eastern circuit, handed an entire new brief. This rendered a submission of it, to the defendant’s counsel, necessary, and when it was returned, the judges began the consideration of the case anew: but a figurative plan of the land of the Jesuit’s bought by Gra-vier’s vendor, according to the proces verbal of the French surveyor general, referred to by the opening counsel, ante 2J. and 22, which that gentleman had offered to obtain, appeared useful in the investigation of the case and he was requested to procure it. It was sent to Hie dr. fen-dan ts’ counsel, with a request that he might point out any inaccu-a-cy, or produce a more correct one. The letter of this gentleman send, ing it back with an intimation that it was immediately returned, lest ¡,¡3. “ keeping it might be made a pretext for delay, by the opposite *255 party,” bears date of the 22d of January. On the third of the following month the judgment was pronounced, twelve days after the judges were enabled, by the production of the arguments and all the evidence, to proceed to the final consideration of the case.

 Before this application for a re-hearing, Mr. Livingston, on behalf of himself and his co-defendants, presented a petition to the legislature, complaining of the refusal of the supreme court, “ to listen to the argument and authorities by which they could have shewn, that the judgment was void, or to receive their petition,” and praying, “ that some legislative provision might be made for the relief of the petitioners, ike.” The house of representatives rejected his petition