Tompkins J.,
delivered the opinion of the Court.
Marguerite brought her action against Chouteau in the Circuit Court of St. Louis county to recover her freedom. In that Court judgment being given against her, she appealed to this Court. On the trial of the cause, she gave in evidence that her maternal grandmother was an Indian woman; and some of the witnesses stated that they had heard aged persons say, that she was of the Natchez nation, and made a prisoner by the French in the war which terminated in the extinction of that nation.
On the part of the defendant, evidence was given that the appellant was descended from a negro woman in the maternal line. Evidence was also given by the defendant, that many Indians were sold as slaves in the province of Louisiana, while it was under the dominion of Erance; and also that the maternal ancestors of the plaintiff, appellant here, had been alienated as slaves. The counsel for the defendant prayed the Circuit Court to instruct the jury,
First. That if they found from the evidence, that the maternal grandmother of the plaintiff was ail Indian woman of the Natchez nation, taken captive in war by the French, and that she was held and sold 'as a slave in the province of Louisiana, while the same was held by the French, and prior to the year 1769; or, if they found that her maternal grand mother was an Indian woman taken captive in war, and was held and sold as a slave as above mentioned, then she and her descendants ought to be considered by the jury as being lawfully slaves. ' .
Second. If the jury find that the maternal ancestor of the plaintiff was an Indian or negro woman, and that she was held as a slave in the province of Louisiana, while it was held by the French, she and her descendants ought to be taken by the jury to have been lawfully slaves.
Third. That Indians might lawfully be reduced to and held in slavery in the province of Louisiana, while it was subject to the crown of France.
These instructions were given by the Court and resisted by the plaintiff; other instructions prayed by the defendant and resisted by the plaintiff, were given, but each side being anxious for a decision on the merits of the caso, no notice need be taken of minor objections.
On the part of the appellant it is insisted, that all Indians in the late province of Louisiana, were, while it was held by France, and Spain, absolutely free, and that their descendants are so now. Negroes it is admitted are to be presumed slaves, *376 their ancestors being imported to the continent as slaves; but Indians were around and among the settlements of the white men, in the full enjoyment of their personal liberty, acknowledging no inferiority to white men, and treating them either as national friends or national enemies. To show a descent from this race, it is contended, is to show a right to freedom ; and, if in the history of the country there were a time when Indians might, under the sanction of law, be reducedfo slavery, then the proof of a right to freedom, by virtue of descent from an India.nj.bec"ómes liable to be rebutted by evidence bringing the case of the claimant under the operation of such law. 1 Washington, 123 and 233, Jenkins v. Tom, and Coleman v. Dick and Pat; and 2 Hen. and Man., 160.
On the part of the appellee it is contended, that his right to hold the appellant in slavery, is established by the practice of the country, at the time her supposed maternal ancestor was made a prisoner of war; and he gave evidence that, while Louisiana belonged to the crown of France, there were many Indian slaves at Fort Charires and other villages in that province. One of the witnesses most relied on, says, that he arrived in the country in 1756, and in 1757 went to Fort Chartres; and that there were then at that place, and elsewhere through the country, a great many Indian slaves, and butfew blacks; the Indians were universally acknowledged as slaves, and frequently sold as such before the Governor; he himself sold several, one to the commandant, and afterwards added, that the commandant he spoke of was the English commandant at Iiaskaskia. The appellee puts his right to hold the appellant in slavery on the same ground, whether she be descended in the maternal line from an Indian or a negro woman. It was further contended for the appe ee, as ev dence of the law of the land, that the French commandant Bourgmont, bought Indians for slaves on the Missouri, and sent them down to New Orleans to work on his plantation, and he urges thatthis act demonstrates more clearly what was the law of the land than a speech of the same person in which white men were censured for trading with Indians for slaves. Reference is made to 3 Martin Rep. 285, Seville v. Chretain, and 3d volume Du Pratz’ History of Louisiana, where the author gives an account of B.ourgmont’s voyage from Fort Orleans, on the Missouri, to the Padoucas, a tribe living west of the Kansas river, and of the object of that voyage.
It appears from the evidence that nearly one hundred years before the commencement of this suit, the-supposed maternal grandmother of the appellant was brought to Fort Chartres, in Louisiana, and was there held as a slave till her death. If then, under the laws of France, she was justly held as a slave, the appellant is at-this time in the same condition, the law of nations securing to the claimant his property, when the province was transferred by France to Spain, by the secret treaty of 1763, and the several treaties when the same was transferred by Spain to France, and by France to the United States. The only case in point decided by any Court in the United States sinca the transfer of Louisiana, of which this Courtis informed, is that of Seville v. Chretian, referred to by the appellee. Seville, Ihe plaintiff in that case, was the grandchild in the maternal line of an Indian woman, brought into the province by an Indian trader in the year 1765, and by him sold to the father of the appellee. Her introduction into the province, and the sale to the ancestor of the appellee, both took place af er the cession by France to Spain, and before'Spain had taken possession. She, like the ancestor of the appellant in the case before this Court, was held as a slave till her death, and as she was reduced to slavery before Spain had introduced her laws into the province, the question of freedom or slavery *377 was decided under the laws of France. That Court decided that during the time Louisiana was held by the French government, Indians might lawfully be held in slavery. A manuscript copy of the report of that case has been submitted to this Court; according to it, “ a number of depositions (admitted by the parties to have been correctly taken, and to be proper evidence in the cause) were read to prove that at the time the Spanish government took possession of the country, viz : in the year 1769, under the secret treaty of cession made between France and Spain in 1763, many of the inhabitants of the colony, which had been established and settled under the authority of the French government, held and possessed Indians as slaves ; and it seems, adds that Court, to have been a belief pretty general amongthem that the practice of holding Indians in slavery was tolerated and authorized by the government. The fact that a considerable number of Indians and their descendants were held in slavery at the period alluded to is clearly proven.”
The case of Seville v. Chretien being mostly relied on by the counsel in the cause before this Court, and in fact the arguments in each case being nearly the same, that case will be particularly examined. In that case the Court are made to say, according to the manuscript report furnished us, a slavery, notwithstanding all that may have been said and written against it as being unjust, arbitrary and contrary to the law's of human nature, we find in histoiy to have existed from the earliest ages of the world down to the present day.”
In investigating the rights of the parties now before the Court, it is deemed unnecessary to inquire into the different means by which one part of the human race have, in all ages become the bondsmen of the other, such as captivity, being the offspring of those already enslaved, &e. However, we are of opinion that it may he laid down as a legal axiom, that in all governments in which the municipal regulations are not absolutely opposed to slavery, persons already reduced to that state may he held in it; and we assume it as a first principle, that slavery has been permitted and tolerated in all the colonies established in America by European powers, most clearly as relates to the blacks or Africans, and also in relation to the Indians, in the first periods of conquest and colonization. Taking this principle for granted, it accounts in some measure for the absence of any legislative act of the European powers for the introduction of slavery into.their American dominions. If the record of any such act exist we have not been able to find any trace of it. It is true, that Charles the fifth in the first part of the sixteenth century granted a patent to one of his Flemish favorite^, lor the exclusive right of importing four thousand negroes into America, which were purchased by some Genoese merchants, who were the first who brought into a reguiar form the commerce for slaves between Africa and America.
A few yeais before, a small number of negroes had been introduced by the permission of Feidinand ; but the privilege granted by the Emperor, so far from being the first introduction of slavery into the new W'orld, was intended as a means of enabling the planters to dispense with the slavery of the Indians, who had been reduced to a state of bondage by their European conquerors. Afull account of these transactions may lie seen in Robertson’s History of America. On turning our attention to the first settlement of the British colonies in America, we find that the introduction of negro slaves into one of the most important was accidental. In the year 1616, as stated by Robertson, and 1620 by Judge Marshall in his life of Washington, a Dutch ship from the coast of Guinea sold a part of her caigo of negroes to the planters on James r.ver; this is the first origin of the slavery of the blacks in the British *378 American provinces, about twenty years after slaves were introduced into New England.
All this took place without any previous legislative act on the subject. And it is believed that Indians were, at the same time, and before, held in bondage. The absence of any act or instrument of government, under which their slavery, originated, is not a matter of greater surprise than that there should be none found authorizing the slavery of the blacks. The first act of the Legislature of the province of Virginia on the subject of the slavery of the Indians, was passed in 167U, and one of its provisions, as we are informed by Judge Tucker, prohibits free or manumitted Indians from purchasing Christian servants. The words “ free or manumitted ” are useless and absurd, if there did not exist Indians in slavery, and Indians who had been slaves and had been manumitted before and at the time this act was passed. Indeed, from the history and legislative proceedings of the British colonies, both in the West India Islands and in North America, it clearly appears that in most if not all of them, the slavery of the Indians was tolerated by government in the early periods of the settlement, without any specific legislation on that subject. -The French government was later in establishing colonies in America than the British and Spanish. In our researches on the subject under consideration, we have not been able to discover any legislative act of it, by which the colonies were authorized to hold Indians in bondage; but that it was customary to purchase and hold some classes of them in slavery cannot be doubted. This cannot have been without the permission, or at least the toleration of government. Moreau de St. Mery, speaking of the black population of St. Domingo, observes, that among it are the descendants of some Indians from Guiana, Louisiana, &c., whom goverment and individuals, in violation of the law of nature, deemed it profitable to reduce to slavery, 1 hist. St. Dom. 67. In the beginning of the eighteenth century, he adds, there were upwaids of three hundred Indian slaves in the French part of St. Domingo. In 1830, the Governor of Louisiana sent three hundred of the Natchez tribe to be sold. Several arrived after that period from Canada and Louisiana. Here we have historical f'acls, establishing beyond contradiction, the holding of Indians as slaves in one of the French colonies, many of whom were transported from the very colony in which the ancestors of the plaintiff and appellant were held in bondage. Were it necessary to prove that they were legally held so, the evidence of it would be found in their being taxed as slaves, 2 St. Dom. Laws 541: a circumstance which creates at least a very violent presumption that the municipal regulations of the French colonies did not prohibit the slavery of the Indians. This appears to have been the opinion of the Spanish government which we have seen succeeded to the French in Louisiana. Governor O’Reilly in 1769, on taking possession of the colony, discovered that a considerable number of Indians were held in slavery by the French colonists. This he declared by a proclamation to be contrary to the wise and pious laws of Spain ; but by the same iustrument he confirmed the inhabitants in possession of such Indian slaves until the pleasure of the King in this respect could be known. Here is then a recognition of the right of the possessors to hold their Indian slaves, until the legislative will of the monarch should deprive them of it. This never did happen. In conformity with this opinion is a decree of the Baron de Carondelet, twenty-five years after, in 1794^ by which he orders two Indians, Alexis and David, to return to and abide with their owners, until the royal will was expressed to the contrary. The inhabitants of the colony of Louisiana, while under the government and dominion of France, held In *379 dians in slavery. The Spanish government under which they passed, recognized their right to hold them until it should be altered by a declaration of the King’s will: it never was declared. The colony, without any change in the condition of the original population, is re-ceded to the French nation, and by it transferred to the United States, under a treaty securing to its inhabitants their rights to property as they stood under the former government. The rule of law first settled by that Court, and which is called a legal axiom, viz: “That in all governments in which the municipal regulations were not absolutely opposed to slavery, persons already reduced to that state may be held in it,” might perhaps be more accurately expressed in these terms, “ that in all governments where there is no positive law against slavery, those persons already reduced to that state may be held in it.” As all the reasoning both in the case of Seville v. Chretien, and in that before this Court, seems to be founded on this legal axiom here assumed, it becomes necessary to examine whether it be true in fact. Under the dominion of the Roman emperors, it is well known to all persons conversant with history, that there were great numbers of slaves in Europe. On the decline of that empire, when it was overrun by the northern barbarians, the number of slaves was not lessened; at this period slavery no longer exists there. Those who recollect the difficulties encountered by Peter the first of Russia, an arbitrary and most politic prince, when he attempted to change the uniform of his life guards, will scarely contend that the Kings of Europe, never arbitrary, were able by written laws alone to abolish slavery. By the force of public opinion alone it has been abolished in Europe. Montesque, in chap. 8, b. 15, of the Spirit of Laws, says, “ Plutarch tells us, in the life of Numa, that in the age of Saturn there was neither master nor slave, in our climate Christianity has restored that age.” “Dans nos cli-mats le Christianisine a rainene cet age.” In the succeeding chapter of the same book entitled “ Inutility of Slavery among us,” he says, what makes me think so is, that before Christianity had abolished civil slavery in Europe, &c., “ ce qui me fait penser ainsi c’est qui avant que le christianisme eut eboli en Europe la servitude civile, &c.” Doctor Robertson the historian above referred to, in a sermon preached in Edinburgh on 6th Jan., 1775, before the society for the propagation of Christian knowledge, ascribes the abolition of domestic slavery in Europe to the influence of Christianity. This sermon is prefixed to some of the later editions of the works of the historian. Vattel, speaking of the right to make slaves of prisoners of war, concludes the article in these words, “1 shall dwell no longer on this subject, and indeed this disgrace is now happily extinct in Europe,” see Law of Nations, b. 3, ch. 8, sec. 152. Sir Wm. Blackstone tells us, that when tenure in villenage was virtually abolished by the statute of Charles the second, there was hardly a pure villein left in the nation ; and then he adds, Sir Thomas Smith testifies that in all his time (and he was Secretary to Edward the sixth) he never knew a villein in gross throughout the realm, see 1 Bl. Com., p. 96. The abolition of slavery in England too is by that author ascribed to the influence of Christianity. The same author informs us also that when an attempt was made to introduce slavery into England by Stat. 1 Edward VI, chap. 3, which ordained that all idle vagabonds should be made slaves, &e., the spirit of the nation could not brook this condition even in the most abandoned rogues, and therefore this statute was repealed in two years afterwards. Thus we see that in England so far were the people from being disposed to suffer one man by force to enslave another, even the boasted omnipotence of Parliament was unable to introduce slavery in the reign of Edward the sixth. If the Parliament of England dare *380 not attempt to enforce slavery by law, it will scarely be contended that any other government in Europe would be strong enough to succeed in the attempt. None of them at least have been rash enough to make the experiment. We will pass over the writ granted by Lord Mansfield to bring before him the body of James Sommerset, and the unanimous decision of the Court of King’s Bench, in consequence of .which Mr. Christian declares, that the air of England is too pure for a slave to breathe in.
Thus we see that in Europe, where slavery once prevailed, it has by the silent influence of the Christian religion alone been abolished, and so far is the spirit of the people from tolerating the practice, that the most energetic government on that continent has not been able to restore it. The legal axiom then of the Supreme Court of Louisiana, viz; “ that in all governments in which the municipal regulations are not absolutely opposed to slavery, persons already reduced to that state may be held in it,” is no axiom. The natives of Europe then migrating to America carried with them no unwritten law to authorize them to enslave an Indian. But that Court assumes the ground, “ that slavery has been permitted and tolerated in all the colonies established in America by European powers, most clearly as relates to blacks or Africans in the first periods of conquest and colonization,” and refers to Robertson’s history of America as authority to sustain the assumption. But it is also contended that this toleration and permission of slavery was not by means of any legislative act for such purpose made. Admitting that the European powers silently permitted their subjects to enslave the Africans, this would be no evidence in a Court of law against an Indian contending for freedom. It would be a violation of the plainest rules of evidence. It is not therefore conceived necessaiy to embarass this question with an inquiry whether the several powers of Europe tacitly or expressly by legislative act permitted their subjects to capture Africans and sell them as slaves in America. As however the counsel for the appellant has furnished an authority to show that it was by an express law of France that her subjects traded in African slaves j that authority will be given to satisfy those who may think there is need of it. Itis found in the 4th chapter of 1st vol. of Spirit of Laws, entitled, “ another origin of the right of slavery.” The author concludes his chapter in these words: "Louis XIII was extremely uneasy at a law by which all the negroes of his colonies were made slaves j hut it being strongly urged to him, as the readiest means for their conversion,he acquiesced without further scruple.” But although Spain might either by an express legislative declaration, or by her silence and forbearance, permit the Indians within the limits of her colonies to be enslaved, yet still this is no evidence that France extended the same privileges to her colonists. It does not however appear that Spain ever granted her assent to this practice either expresly or impliedly. She-acquiesced in it, and assented to it, as England acquiesced in and assented to the Norman conquest, because she could not prevent it: and to prove this we need resort to no other authority than that of the great and accurate historian by whom, according to the report of the case of Seville v. Chretien submitted to us, the Supreme Court of Louisiana undertakes to prove the contrary. In the 8th book of the History of America, Robertson takes a view of the interior government, commerce, &.C., of the Spanish colonies $ after vindicating the Spanish monarehs from the charge of forming a plan to exterminate the natives, he says, “ the Spanish monarehs, far from acting upon any such system of destruction, were uniformly solicitous for the preservation of their new subjects. With Isabella, zeal for propagating the Christian faith, to *381 gether with the desire of communicating the knowledge of truth, and the consolations of religion, to a people destitute of spiritual light, were more than ostensible motives for encouraging Columbus to attempt his discoveries. Upon his success she endeavored to fulfil her pious purpose, and manifested the most tender concern to secure not only religious instruction, hut mild treatment, to that inoffensive race of men subjected to her crown. Her successors adopted the same ideas; and on many occasions which I have mentioned, their authority was interposed in the most vigorous exertions, to protect the people of America from the oppression of their Spanish .subjects. Their regulations for this purpose were numerous and often repeated. They were framed with wisdom and dictated by humanity. After their possessions in the new world became so extensive, as might have excited some apprehension of difficulty in retaining their dominion over them, the spirit of their regulations was as mild as when their settlements were confined to the islands alone. Their solicitude to protect the Indians seems rather to have augmented as their acquisitions increased; and from ardor to accomplish this, they enacted and endeavored to enforce the execution of laws, which excited a formidable rebellion in one of their colonies, and spread alarm and disaffection through all the rest. But the avarice of individuals was too violent to be controlled by the authority of laws. Rapacious and daring adventurers, far removed from the seat of government, -little accustomed to the restraint of military discipline while in service, and still less disposed to respect the feeble jurisdiction of civil power in an infant colony, despised or eluded every regulation that set bounds to their exactions and tyranny. The parent state, with persevering attention, issued edicts to prevent the oppression of the Indians; the colonists regardless of these, or trusting to their distance for impunity, considered and treated them as slaves. The Governors themselves, and other officers employed in the colonies, several of whom were as indigent and rapacious as the adventurers over whom they presided, were too apt to adopt their contemptuous ideas of the conquered people; and instead of checking, encouraged or connived at their excesses. The desolation of the new world should not then he charged on the court of Spain, or be considered as the effect of any system of policy adopted there. It ought to be imputed wholly to the indigent and often unprincipled adventurers, whose fortune it was to he the conquerors and first planters of America, who, by measures no less inconsiderate than unjust, counteracted the edicts of their Sovereign, and have brought disgrace upon their country.” We have still higher authority, that in the State of Virginia Indians were never enslaved but by express law, viz : the acts of the provincial assemblies. It will not here he enquired whether Judge Tucker, in his notes on Blackstone, is at variance with himself, sitting as a Judge of the Court of Appeals in his own State. Suffice to say, that he does not intimate any change of opinion. In 1679, the Legislature of Virginia, by a legislative act, permitted Indians taken prisoners in war to he enslaved, and this act was repealed in 1691. The Courts of that State have uniformly decided that any person claiming an Indian as a slave must show property acquired within the twelve years during which the law remained in force, and Indians have sued for and obtained their freedom in the Courts of that State after being held in bondage neai'ly one hundred years. Sec 1 Washington’s Rep. 123, Jenkins v. Tom, and page 233, Coleman v. Dick, 1 Hen. and Mun. 134, Hudgens v. Wright, and 2 Hen. and Mun. 149, Pallas and others v. Hill and others. In the last cited case, viz: Pallas and others v. Hill and others, the subject is most fully investigated. Before that time some doubt had existed, not as to the time when *382 the statute had first authorized the enslaving of Indians, but as to the time when that right was taken away. The Court it appears, had taken time to search for the original acts and had found them, and the decision was, “that the act of 1691, and not the printed revisal of 1705, fixes the period at which the right of making slaves of Indians was restricted.’’
In such a case as this it might not be improper to attend to. the argument of the counsel employed in the cases cited, as authority in the cases cited from the Virginia booksthey were men not unknown to fame. In the case of Coleman n. Dick and Pat., Wickham was for Coleman, who claimed a right of property in the Indians, and Marshall was for them ; and in the case of Hudgens v. Wrights, Randolph (pdmund) was for the persons claiming the right of property in the Indians. In neither of these cases cited did the counsel pretend to claim for their clients a right o£ property in Indians, except by the statute of the province. In the case of Hudgens v. Wrights, the persons suing for freedom had been brought before the high Court of Chancery. The defendant in that Court being about to send them out of the State, a writ of ne-exeat was obtained from the Chancellor, on the ground that they were entitled to their freedom. On the hearing, the Chancellor perceiving from his own view, that the youngest of the appellees was perfectly white, and that there were gradual shades of color between the grandmother, mother and grand-daughter, (all of whom were before the Court,) and considering the evidence in the cause, determined that the appellees were entitled to their freedom ; and moreover, on the ground that freedom is the birth-right of enery human being, which sentiment is, (he says,) strongly inculcated by the first cuticle of our political catechism, the bill of rights. He laid it down as a general position, that whenever one person claimed to hold another in slavery, the onus probandi lies on the claimant. The case was elaborately argued by Randolph for the appellants and George II. Taylor for the appellees. Judges Tucker and Roane delivered long opinions reviewing the opinions in the cases of Jenkins v. Tom, and Coleman v. Dick and Pat, in 1st Washington ; Judges Fleming, Carrington and Lyons, president, concurred, and the latter pronounced the decree of the Court as follows: “This Court not approving of the Chancellor’s principles and reasoning on his decree made in this cause, except so far as the same relates to white persons and native American Indians, but entirely disapproving thereof, so far as relates to native Africans, and their descendants who have been and are now held as slaves by the citizens of this State, and discovering no other error in the said decree, affirms the same.” This case it may be observed, afforded counsel, always prolific in expedients, a fair opportunity to excite apprehensions for the security of the slave property in that State; so much of the Chancellor’s reasoning as relates to the bill of rights, might, in ordinary cases, have been passed over as extra-judicial; for the complainants have made out their case by proof. Rut the cause was taken up and the Chancellor’s judicial decision affirmed; but his extrajudicial decision was in part reversed, in order, it is reasonable to suppose, to quiet the apprehensions of the slave holders. So far, then, as the conduct of Spain and Virginia towards the native Americans may be regarded as a precedent, we are yet left to judge of the right of the French colonists ta enslave Indians by the conduct of their own government. It is not pretended that there is any written law authorizing the act, and it has been shown by a quotation from Montesquieu that negro slavery was authorized in the French colonies by express law. So that we are not left at liberty to conclude that because without any written law to that effect, the *383 crown of Erance permitted negroes to he reduced to a state of slavery, therefore it permitted the natives to he so. The next inquiry will be whether the assent of the crown of Erance to Indian slavery can be inferred from the acts of its officers, and from the acts and practice of the colonists within the limits of the colony. It will be recollected that it has been stated in the case of Seville v. Chretian, that "in 1730 the Governor of Louisiana sent three hundred of the Natchez tribe to be sold in St, Domingo, and that several after that period arrived from Canada and Louisiana, and that it appeared from the depositions of a number of witnesses, (admitted by the parties to have been correctly taken and to be proper evidence in the cause,) that at the time the Spanish government took possession of the country, viz: in 1769, many of the inhabitants of the colony held and possessed Indians as slaves, and that it seemed to have been 'a pretty general belief among them, that the practice of holding Indians in slavery was tolerated and authorized by the crown of Erance; and by testimony taken in this cause, it appears that at Eort Chartres and elsewhere in the colony, while it was subjecfto France, there were many Indian slaves and but few blacks; and that the Indians were universally acknowledged as slaves, and frequently sold as such before the Governor, that one of the witnesses had himself sold several, one to the commandant, and that afterwards he added that the command* ant he spoke of was the English commandant.”
We are indebted to the case of Seville v, Chretian for tile-knowledge of the facty that in 1730, the Governor of Louisiana sent three hundred of the Natchez tribe to be sold as slaves in St. Domingo. Du Pratz, a historian of considerable merit, and an eye witness of the embarkation of the Natchez sent to be sold in St. Domingo, observes a cautious silence on the subject of the number sent out. From Barbe Marbois we learn all perhaps that Mr. Perier, Governor-General oí Louisiana, ever wished to be known of the number sent. Of Marbois it is sufficient to say, that he was the minister of Napoleon who negotiated the treaty by which Louisiana was ceded to the United States, and that he has lately written a history of Louisiana. He had access to the registers of the company, and there found an account of the facts he states, viz: that the tribe of the Natchez was exterminated, with the exception of a few families who escaped the general massacre and were received and protected by the neighboring tribes. Their chiefs, believed .to be of the family of the Sun, were conveyed by Gen. Perier’s order, to Cape Francois. ’The most important member of the dynasty died there a few months after his arrival. The other Suns were maintained by the company for the moderate sum of 1,888 livres 7 sous. The company applied to M. Maurepas to defray the expense. On the 22d of April, 1731, the minister wrote the directors as follows : "I am not aware- that there is any other course to adopt in this matter than to order the survivors of those two Indian families to be sold or sent back to Louisiana.” The-registers of the company contain the following resolution"It was resolved, to order the sale of the survivors of said families of Natchez Indians.” Upon this the author remarks, that at the very time this order was given, the-company was pretending to- the glory of civilizing a people whose chiefs were sold as slaves. Here we may pause and ask if the company dare not sell a few prisoners of war, without permission from the crown, (for Maurepas was prime minister,) whence did M. Perier, their agent, derive the authority to enslave three hundred of the same tribe. Of the number sent to be sold- as slaves in St. Domingo, bl order of Perier, as was before observed, Du Pratz is silent. He only says that some escaped from the Fort, who retired, to the Chickasaws. The *384 rest surrendered at discretion ; ofthe number, was the great Sun and the female Suns his wives, several warriors, many women, young people and children. The reason of this reserve, we learn from Marbois, for but one volume of Du Pratz is accessible to us. Marbois tells us that Du Pratz ingeniously states, in the 1st volume of his history, printed in 1758, twenty-eight years after the capture and sale of the Natchez chiefs, that all the letters which were sent to Prance were intercepted. We consulted together, continues Du Pratz, on the means of forwarding them to their destination, we discovered it and availed ourselves of it. “The writers of history are obliged,” Du Pratz further observes, “to treat with equal caution the dead and the living ; and so delicate a matter is it to give utterance to the truth, that the pen often falls from the hands of those who are most disposed to be accurate.” The colonies of Spain were planted by adventurers who fitted out expeditions and conquered at their own expense. The crown of Spain, the historian tells us, made great exertions to curb their tyranny, but was unable. The colonies of France on the continent, were planted at an enormous expense by the crown, and were always weak and under her control. Public utility, says Marbois, as well as the greatness and glory of the monarch, had, under Lous XIY, led to the favorable reception ot the first proposals for the foundation of a powerful colony.
With the example of Spain before their eyes, impotently struggling to restrain the insolent rapacity of her conquering soldiery in America, and stung by the reproaches of the world for her supposed barbarous and ruinous policy, what utility to the State, or glory to themselves, could the powerful and enlightened Monarchs of France hope for, by suffering the colonists of tho weak province of Louisiana to reduce the natives to slavery ?
But the counsel for the appellee, as before observed, contended as evidence of the law of Prance that M. Bourgmont, the French commandant, had purchased Indian slaves and sent them down to Orleans, and that this act of a confidential officer was stronger evidence of the law than the speech of the same commander, in which he severely reprehended the practices of the white men who traded for Indian slaves. M. Bourgmont, (according to Du Pratz, see chap. 9, vol. 3,) commandant of Fort Orleans, situated on the Missouri river, (on an Island a little above the mouth of the river Osage according to Stoddard,) departed from that Fort on the 3d July, 1724, at the head of a small force, to make a peace with the Padoucas, (Pawnees,) who were at war with the Missouris, Kansas and other tribes in alliance with the French. The warriors of the friendly tribes were to accompany him. The expedition, the author says, was undertaken by the order of the King of France, and the object was to facilitate the commercial intercourse ofthe French traders with the several tribes. On the arrival of the French commandant among the Kansas, he made the speech alluded to, and purchased from them several Indian slaves, (so called because the Indians made slaves of their prisoners.) Those prisoners had been taken from the Padoucas, hut M. Bourgmont and several of the persons accompanying him, falling sick of the fever peculiar to the season, he sent some of the slaves down the river to the said Fort of Orleans, and in a few days after followed himself, having previously despatched a messenger to the Padoucas to inform them of his inability to proceed. This messenger conducted two of the Padouca slaves, (eselaves Padoucas) to their tribe in order to conciliate their favor, see same vol. p. 165. The slaves, says the author, at p. 169, having arrived at their village, spoke much of the generosity of M. Bourgmont, who had redeemed them; they told all he had done to make peace; in fine *385 they extolled the goodness, the merit and the valor of the French, so much that their discourse made in the presence of the Grand Chief, spread joy over the village, and a messenger was sent to announce the news to the whole nation. Bourgmont being restored to health resumed the expedition, and on the 18th October arrived among the Pawnees (Padoucas) where he was received in the most flattering manner. The great-chief in a harraiigue to his countrymen tells them thatthe Kansas would surrender all their women and children taken prisoners in war, in exchange for horses; “that the French chief had promised it,” and he continues, “you have already seen him send back two of them loaded with merchandize, without demanding pay, and he was bringing along with him two others who died on the road.” Thus it appears that the prisoners purchased by the French commandant were bought or rather redeemed, for that is the word used by the author, with an intent to present them to their own tribe.
The author says that his account of his expedition was copied and greatly abridged from the journal of Bourgmont, signed by all the officers and persons attached to the expedition, and which no doubt was designed for the use of the government.
In reading it, he remarks, one cannot but observe how much delicate management is necessary in such expeditions in order to gain their good will. In the conduct of the high officers, there is nothing to be perceived which would justify the belief that the French government authorized them to reduce the Indians to slavery. Even should we admit that the sale of the three hundred of the Natchez by order of Perier was known to and approved by the government, still there was no proof that the appellant’s ancestor was one of them ; and if there had been any such proof, still it might be doubted whether her purchaser would have the right to bring her back from St. Domingo to Louisiana. But the conduct of the directors of the company of the Indies affords the strongest presumptive evidence that the act of Perier was unauthorized and even unknown to them. For if he could of his own authority lawfully sell three hundred Indians, why should they apply to the minister for permission to sell perhaps half a dozen. It is also said in the case of Seville v. Chretian, other Indian slaves were sent over from Louisiana and Canada. This perhaps may be the case. But it does not sufficiently appear, under what circumstances they were sent, to enable us to decide whether the act was lawful or unlawful. Between foreign nations the acts of the public officers of each are always regarded by the author as lawful until they are disavowed. But in regard-to the cause before this Court we are not foreigners. In consequence of the several transfers of territory which have taken place since the year 1763, this Court has succeeded to all the jurisdiction which a French Court of law would have have had at that day, and in deciding the rights of individuals it becomes a duty to scrutinize the acts of the public officers of France as minutely as we would those of our own government. To say then that other Indians from Canada and Louisiana were sent to be sold as slaves in St. Domingo is not sufficient. As much might have been said of the transportation and sale of the Natchez ; but the act was notorious; the circumstances were generally known and by reason of the notoriety, we-are enabled to form an opinion of its legality or illegality; of the other it is not even said by what authority they were sent. It remains to enquire on this branch of the subject whether the practice of the French colonists is evidence of an implied assent of the government to permit them to hold Indians as slaves.
*386 We have turned to Europe and found slavery disappearing from that continent since the middle ages by the mere force and effect of public opinion, and that the most powerful and energetic government in that quarter of the world was unable, by a statutory provision, so far to overcome public opinion as to restore slavery, even in the persons of the most abandoned and profligate convicts. We have seen Spain making the most vigorous exertions to protect the native Americans from the violence of her lawless adventurers who conquered the new world for her, and only desisting when her efforts became useless, thereby protesting against the practice. We have seen the highest Court of Virginia, where it was contended that the aboriginees were allowed to be reduced to slavery without any express warrant of law, discharging from the bonds of slavery those whose ancestors had been for nearly one hundred years held in slavery, merely because they had proved a descent in the maternal line from an Indian woman; and even the advocates of the parties claiming to hold them as slaves not presuming to base the client’s claim on any thing but the statutory law — counsel, too, whose reputation forbids one to entertain the idea that they were not profoundly versed in the history and laws of their country. We have the authority of Montesquieu for saying, that Louis XIII. was with difficulty prevailed on to pass a law to authorize his colonies to enslave the Africans. Consequently, as before observed, the frenchman migrating to Louisiana carried with him no unwritten law to authorize the enslaving oí the native Americans. Did then the crown of Prance, by a silent acquiescence, assent to the slavery of these persons? Mr. Justice Blackstone (63d page of the first vol. of his commentaries,) tells us that the monuments and evidences of the legal customs of England are contained in the Records of the several Courts oí Justice, in books of reports and judicial decisions, and in the treatises of the learned sages of the profession, preserved and handed down to us from the highest antiquity.
The monuments and evidences of the Roman unwritten law’, according to Mr. Butler, (see Hone Juridica Subsesivce, p. 43,) are the Editnm, Pmtoris and the Responses Prudentum, which words, liberally translated, mean the decisions of the Praetors’ Court, and the opinions of the learned sages of the profession, and it is fair to presume that in all enlightened .countries similar rules prevail. The opinions and legal doctrines of the civilians, as well as those of the learned sages of the common law, were very highly respected: but till they were ratified by a judicial decision, they had no other weight than what they derived (says Butler) from the degree of public estimation in which the persons who delivered them were held. The evidence taken in this cause, and offered to prove the French law, is, that during the time the province was subject to France, there were at Fort Chartres and elsewhere through the country, a great many Indian slaves and but few blacks. The Indians were universally acknowledged as slaves, and frequently sold as such before the Governor, The witness himself had sold several: one to the commandant, that he brought from Mississippi, and afterwards adds that the. commandant he speaks of, was tile English commandant at Kaskaskia; and from the case of Seville and Chretian, further evidence of the French law is offered. It is in the following words: “ It appears from the depositions of a number of witnesses, (admitted by the parties to have been correctly taken and to he proper evidence in the cause,) that at the time the Spanish Government took possession of the country, viz., in 1769, many inhabitants of the colony held and possessed Indians as slaves, and it seems to have been a belief very general among them, that the practice of holding Indians in slavery, was tolerated *387 and authorized by that government.” It is here endeavored by the counsel for the appellee, to assimilate the sale before the commandant, to a judicial decision. We know as a matter of history, that un.ler the Spanish rule, in Louisiana, a commandant was a military officer contmai.d.iig at a post, such as Kaskaskia then was.
To this militaiy officer, for a want of more intelligent person, a civil jurisdiction, about equal to that of a Justice of the Peace in our own State, was commonly entrusted. Even a jud ciat decision by such a person, after argument by able counsel, would be esteemed of veiy little weight. But the witness says he had seen sales of Indians made before the Governor; lie himself had sold several, one to the commandant. This governor and commandant are probably one and the same person, but that is immaterial. In what part of this world is a judical officer, immaterial what may he his grade or intelligence, bound to pry into the contracts of persons who buy and sell in his prerence? Or rather, in what civilized country is he not bound by the rules of common sense to refrain from giving any opinion on the legality or illegality of such contracts? But this commandant or Governor was a British officer, and, if we may judge of his rank by the importance of the post, as probably a non-commissioned officer, as a commissioned officer. That, however, is immaterial, for no one conversant with judicial proceedings, would suppose that either the one or the other was versed in the laws prevailing in Louisiana while it belonged to France. If the acts of ownership, done by the colonist in the presence of the Governor, were no evidence of a law authorizing such acts, there can surely he no reason why such acts done out of his presence should be evidence of such a law. The able counsel who argued the cases cited from the Virginia Reports, if such arguments as these be worth any thing, must have been very inattentive to their clients’ interest not to have urged them. But there remains the testimony of the witnesses who testified that it was generally believed that the slavery of Indians was tolerated and authorized by the French government. We have seen that the evidences of the unwritten laws of England and Rome were the decisions of their Courts and the opinions of men learned in the laws, in the language of the civil lawyers, Responsa Prudentum. The opinions of such men, says Mr. Butler, were highly respected, but till they were rat.fied by a judicial decision, they had no other weight than what they derived f'O’.n the degree of public estimation in which the persons who delivered them u'ere held, the weakest evidence of the law hitherto recognized by law writers ; but here we have the evidence of nameless witnesses mostly, and it is not even pretended th it thoie who are named have any claims to law knowledge. As a blind man would not be received to testify concerning colors to a juiy.or a deaf man concerning sound j, so it seems reasonable that those who manifest by their discourse an utter ignorance of law, should not be received to prove it before a Court of law. It seems to be a wise rule to receive no lower evidence of the law than the treatises of the learned sages of the profession, or in the language of the civilians, “Responsa Prudentum.” Such evidence of the genera] law of the land was, probably, never belore the case of Seville and Chretian, offered in a Court of law, and had not the consequences of the decision in this cause been very important, it would not have been deem -d material to bestow' so much attention on this matter. In the case of Seville and Chretian, we are also told that Governor O’Reilly, on faking possession of the colony in 1769, discovered that a considerable number of Indians were held in slavery by the French colonists. “ Tiffs he declared by a proclamation to be contray to the wise and pious laws of Spain, but by the same instrument he *388 confirmed the inhabitants in the possession of such Indian slaves until the pleasure of the King in this respect could be known. Here then, it is said, is an excellent recognition of the right of the possessors to hold their Indian slaves until the legislative will of the monarch should deprive them of it. In conformity with this opinion of Governor O’Reilly, it is said, is a decree of the Baron de Carondelet, twenty-five years after, in 1794, by which he orders Alexis and David to retnrn to and abide with their owners until the Royal will was expressed to the contrary.”
By the law of nations, the inhabitants of a ceded, and even of a conquered province, “ retain their mcient municipal regulations, v/niil they are abrogated by some act of the new Sovereign,” and their property, too, until they forfeit it by some criminal act.
If then the French colonists had, under the French rule, a right to hold the Indians in slavery, they could not by tiie subsequent introduction of the laws of Spain be deprived of that right, and it would be unreasonable to suppose that any King of Spain who has sat on the Throne for the last three hundred years, would so far disregard public opinion as to attempt to give his laws a retrospective effect. If the Governor intended by his proclamation to quiet them on their claims, he did a very weak act in telling them that they held their Indian slaves in violation of the laws of Spain. For most certainly if they derived from the government of France no right to hold the Indians in slavery, he had no power to dispense with the laws of Spain which prohibited Indian slavery.
For more than two hundred years previous to that time, by the famous regulations of Charles V. of which mention is made of the case of Seville and Chretian, Dr. Robertson says the high pretensions of the conquerors of the new world, who considered its inhabitants as slaves, to whose service they had acquired a full right of property, were finally abrogated. From that period to the present time, Indians have been respected as free men and entitled to the privilege of subjects. The historian tells us also, that all laws and ordinances relative to the police and government of the colonies, originated in the Royal Council of the Indies, and must be approved of by two-thirds of the members before they are issued in the name of the King. To that Council, each person employed in America, from the Viceroy downwards, is accountable. It reviews their conduct, rewards their services, and inflicts the punishment due their malversasions: see Rob, Hist. America, B. 8. From the copy of this proclamation furnished by the counsel of the appellee, dated 7th Dee. 1769, it appears that the Governor forbade any person whatever to acquire any property in any Indian whatever. We find in it these remarkable words: “It is also oidained that the actual proprietors of said Indian slaves shall not dispose of those whom they hold, in any manner whatsoever, unless it he to give them their freedom. Awaiting the orders of his Majesty oil this subject, we enjoin upon the said proprietor to go and make their declaration at the office of the Recorder, by giving the name and the nation of said Indians, and the price at which the proprietors shall value them,” and the commandants of the several districts are commanded to make returns to the Clerk of the Cabildo at New Orleans, of all the Indians whose names shall be entered with the Recorders. O’Reilly probably intended to liberate them. He well knew that he had no authority to restrain the colonists irom alienating property which they lawfully held when they came under the dominion of Spain. But O’Reilly was removed. The Court of Madrid, we are told, secretly disapproved the acts of outrage which he committed on taking possession of the colony. Six of the principal colonists had by his order been executed for their opposition to his *389 landing. Marhois hist. 138. Had not O’Reilly been removed from office, it is probable the will of the Monarch would have been made known 'to them in such manner as it is usually made known in civilized countries, not by a new law to make that unlawful which was before lawful, but through a ministerial officer to summon the holders of those Indian slaves to appear before some judicial tribunal, to showby what authority they were held in bondage. It is in no part of the proclamation intimated that the colonists should be confirmed in the possession of such Indian slaves until the pleasure of the King in this respect could be known. But they were commanded in the most positive manner, not to dispose of those whom they held in any manner whatsoever, unless it be to give them their freedom.
How this command not to dispose of their slaves in any manner whatsoever, unless it be to give them their freedom, could be construed into an express recognition by the Governor, of their right to hold their Indian slaves until the legislative will of the Monarch should deprive them of it, it is not easy to perceive. Again, who in modern days makes laws to deprive subjects of their property ? To make this construction plausible, we were told in the argument of this cause, that although by the law of nations, the laws of a ceded province remained in force under the new rulers, yet the laws by which the province was governed might afterwards be changed, and their rights taken away ; that the Spanish government was a despotism, and not hound to respect the rights of property in the subject. That the government of Spain is despotic, is perhaps what no writer of the laws of nations, or even historian has ever yet ventured to assert. We have seen on the authority of Dr. Robertson, that all laws and ordinances relative to the government and police of the colonies, originated in the Royal Council of the Indies, and must be approved of by two-thirds of the members before they are issued in the name of the King. To deprive a man of his property, is the act either of a Court of law acting in obedience to the law, the act of a trespasser, or the act of a robber, and not a legislative act. In the com-rnencement of the sixteenth century, the son of Columbus sued Ferdinand the most powerful and unprincipled King who has sat on the throne of Spain for the last three centuries, in his own Court, and obtained a judgment against him on a contract between the King and his father, and also obtained what was due him. It cannot he then that two hundred and sixty years after, when Europe is so much more enlightened, two-thirds of the Royal Council of the Indies would he so regardless of the rights of private persons and of the law of nations, as to approve of a law, the effect of which would be to deprive their fellow-subjects by its retrospective action, of property which they held under their ancient laws. Believing then that O’Reilly, as Spanish Governor of Louisiana, had no legislative power, and that the Crown of Spain would neither on the one hand so far change [he regulations of Charles the V as to give the inhabitants a right of property in the Indians which they had not derived from the laws of France, nor on the other so far violate its faith as to deprive its new subjects of property which was lawfully acquired under their former government, it appears to us to be a forced construction of O’Reilly’s proclamation to suppose that when he commanded the actual proprietors of Indian slaves not to dispose of them in any manner whatsoever, unless it be to give them their freedom, that he thereby designed to recognize “ the right of the possessors to hold their Indian slaves, until the legislative will of the Monarch should deprive them of it.n The most probable construction of that proclamation seems to he, that O’Reilly, well knowing the colonists derived no right from the laws of France to hold the Indians in *390 intended by a strict judicial investigation to ascertain those persons who were so held and therefore his orders were given that no proprietor should dispose of them, except to give them their freedom, and that an exact account of each should he taken and reported to the Clerk of the Cabildo, in order that he might have the means of making the proprietors liable for the safe deliverance of the Indians. The decree of the Baron de Carondelet remains to be considered. By this decree we are told that he, twenty-five years after (the proclamation of O’Reilly,) “in 1794, odered two Indians, Alexis and David, to return to and abide with their owners, until the Royal will was expressed to the contrary.” Nothing of the character of a judicial decision is seen here. It is well known that legal proceedings in those countries in which the civil law prevails, are more formal than among ug where the mode of proceeding is conformable to the principles of the common law. Had these persons sued for their freedom, it became the duty ot the Court to decide whether they were free or not, and by its decree to order them to return to and abide with their owners, until the Royal will was expressed to the contrary. How was the Royal will to be expressed ? The will of the Kings of Europe is expressed in judicial matters through, their Courts of law.
The Kings of Europe, legislators and not executive officers, (executeurs de la loi) Princes and not Judges, have discharged themselves of that part of their authority which might he odious, and bestowing favors in their own persons, have committed to particular magistrates the distribution of punishments. See Montesqueu, Grandeur et deeadance des Romains, chap. 16. The only way to know the King’s will judicially was by an appeal to a higher Court, and unless an appeal had been taken it was useless to tell them to wait till the King’s will were known. For any 1hing appearing by this statement, there might have been no suit instituted. It might have been a mere tradition believed and current in New Orleans, and entitled to no more credit than the legal opinions of the number of nameless witnesses whose depositions (admitted by the parties to have been correctly taken and proper evidence in the cause) were read in the case cited. The history of Louisiana affords abundant evidence that the Crown of France did not feel less solicitude nor exert less industry to ameliorate the condition of the Indians of that province than the Crown of Spain did to ameliorate that of the Indians of South America. Du Pratz, and Marbois after him, attribute the blame of the Natchez war to the ill conduct of the French officers and not to any plan or contrivance of the French government. Du Pratz devotes many pages of the third volume of his history to demonstrate what interest the Crown of France fell in maintaining a good understanding with the various tribes. and indeed what history of the French settlements in America can we read without learning the same thing? As in Spain there was a Royal Council of the Indies, so in France there was a company of the Indies formed in 1723. The Duke of Orleans was declared its Governor. Its privileges embraced Asia, Africa and America. In the deliberations of this association, composed of great noblemen and merchants, India, China, the Factories of Senegal and Barbary, the West Indies, and Canada, were, in turn, brought into view. Louisiana holds a principal place in these discussions. See Marbois, pp. 115 and 116. The French government did not then enter on the business of founding a great and powerful colony in Louisiana without a plan. A part of that plan as has been before said, on the authority of the same author, was to civilize the Indians. In a subsequent page (122) he tells us that in 1748, the Indians were beginning to recover from the hatred with which the French government *391 had momentarily inspired them. The missionaries exerted themselves to make them Christians, and labored with an admirable zeal to make them more humane. The Governors distributed to them cattle and instruments of tillage. It is true that those benevolent cares did not produce the desired effect, but the natives were grateful for them and the Trench were then able to scatter themselves among them without apprehension. They sometimes married Indian women, and were then incorporated into their tribes. The same author says, in another part of his work, (p. 136,) the Louisianians rendered an honorable homage-to the memory of the Governor D’Aba-die, whose death was occasioned by the grief he felt when he was instructed to make known the cession of the colony to Spain. The eulogy states that the Governor severely repressed the excesses of masters towards their slaves, that the Indians were also protected against every kind of oppression. Speaking of the provisions made for them in the treaty of cession to the United States, the author says (p. 293) “ the character of the Indians was well known to the negotiators. The efforts that had been, and the expenses that have been incurred for three centuries, have not effected any change in the habits of the tribes; but they obstinately avoid civilization. These tribes, always children, require to be paternally governed, they preferred the Trench to other nations, and willingly adopted them into their tribes.”
Though they were ready to use freely whatever in our huts or bouses suited their convenience, or to appropriate it to themselves, they were submissive to our orders. They were well inclined to render us services, and even as warriors to unite their arms to ours.” The case of Seville and Chretian was relied on, not only because the decision was made by the highest Court of judicature in the State, and because the Judges were persons of great legal acquirements, but because of the peculiar advantages they enjoyed in the place where their sessions were held to acquire an accurate knowledge of the laws of Trance and of the decisions of the Courts of Spain j whence comes it then, that we have not a more accurate account of this decree {so called) of the Governor Carondelet, concerning' David and Alexis? Or if there were any attempt made to ascertain the will of the King on that subject, (as the Governor is made to intimate there would be,) how does it happen that we hear nothing of a decision of the Royal Council of the Indies, in which Court alone the King is supposed to be present? and that presence too is as much a fiction of law, as the presence of a King of England in his Court of King’s bench. If it he said that it was the business of the party against whom the decision was made to take, and prosecute the appeal, then it may be answered that it was no judicial decision for the Governor to order them to return to and abide with their former owners, until the Royal will was expressed to the contrary. Tor if the order or decree (as it is called) be any thing else than an indirect denial of justice, it means that he intended to relieve them of the trouble of prosecuting their appeal. It has been sufficiently demonstrated to be inconsistent with the general practice of the European powers to suffer their subjects to enslave the natives of America; and it has also been shown that the policy of the Crown of Trance repels the idea that such a practice ever was contemplated by it. A Trench subject then, never could have enslaved an Indian, but by the express permission of his sovereign. We have seen that the register of the colonial regulations is now in existence in Trance, and if any such permission ever was granted, it is the duty of the person claiming the right to establish it by producing some better evidence than the conjectures of unknown persons who seem never to have entertained an idea of any other law than the arbitrary and capricious will of *392 the petty magistrate of the little village where chance had located him. Tayon, the person who held the appellant's maternal ancestor in. slavery at the time of the publication of the proclamation, according to the testimony of his daughter, having seen the proclamation, said that she would be free at his death. Another witness stated that he heard Tayon declare that she was free, and that she staid with him of her own accord. And the appellee’s counsel took the trouble to.bring in the register of Indian slaves made at Fort Chartres in obedience to an order made in the proclamation, by which It appeared that Tayon, then residing at that place, had not registered this woman. Whence it must necessarily be concluded that he did not regard her as his Indian stave, and that he declined registering her name, &c., as required by the proclamation under pretence that she never had been held in slavery. Were we disposed to multiply words, it might be easy to cite evidence from the depositions in this cause, that Indians never were considered slaves under the French government, and those witnesses too perhaps not more unlearned in. the law, than those who deposed otherwise. Indeed one of the appellee’s, own witnesses, one too whose respectability and intelligence was well known in St. Louis, and who would not lose by a comparison with any of the ancient inhabitants found here by the American government in March, 1804, (for the Court may travel out of arecord to inquire after the value and credit of a legal authority,) this witness testified that the Spanish government declared Marie Louise, an Indian woman residing in the family of said Tayon, free, and that many Indians remained with their masters after they were so declared. This witness believed that the maternal ancestor of the appellant was a negro woman, and therefore remained a slave. But we know that the Spanish government declared none free. The Governor O’Reilly’s proclamation was the only public act; those who knew they had' no right to hold Indians in slavery, might well dismiss them as by the proclamation they were allowed to do, and thus avoid a judidicial investigation in which they had nothing to gain and by which they might lose, so that if we were to resort to such loose evidence of the law as the testimony of witnesses who know nothing but by common rumor, the appellee gains nothing. But perhaps too much has already been said on this subject. The decision of this cause is, however, important in its consequences, and in deciding contrary to the opinion of the highest Court of judicature of a sister State, we have the misfortune not to be able to concur all in th.e same opinion.
It is the opinion of a majority of this’Court, that the Circuit Court erred in giving to the jury the first and third instructions above mentioned. The majority of the Court is further of opinion that the Circuit Court erred in so much of the second instruction as related to the descendants of an Indian woman in the maternal line; that is to say, the Circuit Court erred in instructing the jury that if they found the maternal ancestor of the plaintiff was ap Indian woman, and that she was held as a slave in the province of Louisiana while it was held by the French, she and her descendants ought to be taken, by the jury to have been lawfully slaves. In the second instruction there is no other error committed. For the reasons aforesaid, the judgment of the Circuit Court is reversed. This cause was first argued before this Court at the May term of the year 1828.. This Court being then composed of two Judges only, the decision of the Circuit Court was affirmed by a division in opinion of the two. Judges then sitting: at the October term of the year 1833, the, parties by their counsel appeared in this Court, and mutually agreed that the judgment in this cause before rendered in this Court should be set aside, and that it should be again *393 argued before the Court, consisting of all the Judges. The judgment of the Circuit Court being now reversed, two of the Judges concurring in opinion, the cause is remanded to that Court, and it is required to proceed therein in conformity with this opinion.